**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TECNOGLASS HOLDINGS INC., JOSÉ DAES, AND CHRISTIAN DAES,<br><br>Plaintiffs,<br><br>v.<br><br>CHRISTIAN LAMARCO AND SHADYSIDE PARTNERS, LLC,<br><br>Defendants. | Civil Action No. ______________<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs Tecnoglass Holdings Inc., José Daes, and Christian Daes, by and through their undersigned attorneys, bring this Complaint against Defendants Christian Lamarco and Shadyside Partners, LLC (d/b/a Culper Research) (collectively, "Defendants") and allege as follows:

## INTRODUCTION

1. Culper Research is a serial defamation defendant and the alter ego of Defendant Christian Lamarco. Lamarco is a so-called "short seller" who profits by issuing defamatory "research reports" about public companies in which he has taken a short position and then cashing out when the stock price drops as a result of his "research." Defendants hold Culper Research out as an established investment research company and consistently refer to the royal "We" when conveying the company's defamatory "findings." In reality, however, Lamarco is upon information and belief Culper Research's lone member and sole employee seeking to disguise the fact that the entire company consists of only one person with no discernable, substantial real world work experience to speak of. To this end, each report issued under the Culper Research brand

contains a statement on the first page assuring readers that what they are reading is factual and can be relied upon, stating, "all information contained herein is accurate and reliable." Through this charade, Defendants attempt to engender more credibility among members of the investing public than they deserve, and Lamarco profits when those readers trust that Defendants' "research" about public companies is "accurate and reliable" and trade on the basis of Defendants' representations.

2. Plaintiff Tecnoglass is a public company in the construction industry focused on the manufacture of architectural glass and related products. Plaintiffs, brothers José and Christian Daes, are the company's CEO and COO, respectively, and co-founded the company in 1983 in Colombia. Through decades of hard work, the Daes brothers, along with Tecnoglass employees and executives, have built a successful company which has achieved substantial market value.

3. On August 21, 2025, Defendants sought to destroy that hard-earned market value to line their pockets at the expense of Plaintiffs and Tecnoglass's employees and shareholders (including, among numerous others, Plaintiffs José and Christian Daes, who together hold a substantial portion of the company's stock through their investment entity). Defendants made Plaintiffs the subject of one of their defamatory "research reports" (herein, the "Defamatory Report"). Therein, Defendants falsely claimed that the Daes brothers were involved with the operations of the Sinaloa cartel—a major organized crime syndicate. That assertion is wildly and demonstrably false and defamatory. The Daes brothers have nothing to do with the Sinaloa cartel or its alleged illegal campaign finance scheme.

4. Additionally, Defendants falsely claimed that Mexican government intelligence had determined the Daes brothers were involved with the Sinaloa cartel's illegal campaign finance scheme. This too was a blatant lie. Defendants represented that the so-called Mexican intelligence memos they cited to support that claim (herein, the "Fabricated Mexican Intelligence Reports")

were part of a Mexican government-confirmed hack by an anonymous "hacktivist" group. That representation was false. ***Well before Defendants published their Defamatory Report***, eight Mexican governmental authorities—among them the very office to which the documents attribute their own authorship—categorically denied, in sworn statements, having issued, received, or had any knowledge of the Fabricated Mexican Intelligence Reports. In so doing, and as discussed further below, the office that purportedly issued the Fabricated Mexican Intelligence Reports identified evidence on the face of the documents that demonstrated the documents were indeed fake. Notwithstanding this public denial, Defendants represented the documents as government-confirmed.

5. Defendants had a clear financial motive for publishing the false statements and defaming Plaintiffs: as they disclosed in the Defamatory Report, Defendants "are short Tecnoglass," meaning their financial position would only pay off if Tecnoglass's stock fell, giving them a direct stake in the defamatory statements they were spreading. After Defendants published the Defamatory Report, Plaintiffs provided them with the Mexican court decision (with a corresponding English translation) confirming that the Mexican government authorities never produced, possessed, or had any knowledge of the Fabricated Mexican Intelligence Reports that the Defamatory Report relies on, and Plaintiffs demanded Defendants retract their report. Defendants baselessly refused to retract their false claims. Defendants' Defamatory Report had its intended effect: the value of Tecnoglass's shares dropped in intraday trading following its publication and, upon information and belief, Defendants profited financially from the drop. Moreover, Defendants damaged Plaintiffs' reputations by not only leading their own readers to believe the lies but also, in publicizing their own defamatory statements, foreseeably causing other media outlets across jurisdictions to parrot them in subsequent, inaccurate reporting. Plaintiffs

bring this suit to correct the falsehoods Defendants have promoted, restore their reputations, and recover for the damage Defendants have caused.

## THE PARTIES

6. Plaintiff Tecnoglass Holdings Inc. is incorporated in Florida, has its global headquarters in Barranquilla, Colombia, and maintains its principal place of business in Miami, Florida.

7. Plaintiff José Daes is domiciled in, and therefore a citizen of (for purposes of diversity of citizenship), Florida.

8. Plaintiff Christian Daes is domiciled in, and therefore a citizen of (for purposes of diversity of citizenship), Florida.

9. Defendant Christian Lamarco is, upon information and belief, a citizen of New York, New York. Upon information and belief, Lamarco is the sole member and owner of Defendant Shadyside Partners, LLC.

10. Defendant Shadyside Partners, LLC, which, upon information and belief, does business as Culper Research, is incorporated in Delaware and, upon information and belief, has its principal place of business in New York, New York. Because Defendant Lamarco is, upon information and belief, the sole member and owner of Shadyside Partners, it is a citizen of New York.

## JURISDICTION AND VENUE

11. This Court has subject-matter jurisdiction over the state law claims alleged herein under 28 U.S.C. § 1332 because there is complete diversity between the parties, and the amount in controversy exceeds the sum of $75,000 exclusive of interest and costs.

12. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) because all Defendants are citizens of New York and separately pursuant to 28 U.S.C.

§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Southern District of New York.

13. The Court has personal jurisdiction over Defendant Lamarco because he is a resident of New York. The Court has personal jurisdiction over Defendant Shadyside Partners, LLC, because, upon information and belief, its sole member is a citizen of New York.

## FACTUAL BACKGROUND

### A. Plaintiffs' Success In The Construction Industry

14. In 1983, brothers José and Christian Daes founded what would later become publicly traded company Tecnoglass Holdings Inc. Today, Tecnoglass manufactures architectural glass and associated aluminum and vinyl products for the global commercial and residential construction industries.

15. José Daes is the Chief Executive Officer of Tecnoglass and a member of its board of directors.

16. Christian Daes is the Chief Operating Officer of Tecnoglass and a member of its board of directors.

17. Tecnoglass supplies over 1,000 customers in North, Central, and South America. Its customers include developers, general contractors or installers for hotels, office buildings, shopping centers, airports, universities, hospitals and multi-family and residential buildings.

18. Tecnoglass's tailored, high-end products are found on some of the world's most distinctive properties, including the Aston Martin Residences (Miami), Miami World Tower (Miami), 3ELEVEN (New York), Raffles Hotel (Boston), Norwegian Cruise Line Terminal B (Miami), One Thousand Museum (Miami), Paramount Miami Worldcenter (Miami), Salesforce Tower (San Francisco), and AE'O Tower (Honolulu).

19. Tecnoglass has successfully established a leading reputation in the construction market in Florida, where it is incorporated and its headquarters are located and where sales comprised 90% of Tecnoglass's U.S. revenue in the year ended December 31, 2025. In recent years, Tecnoglass has successfully grown its geographic presence in the U.S. outside of Florida, particularly into markets along the east coast, and as a result, nearly 13.1% of the company's U.S. backlog is for projects outside of Florida.

20. Through their decades of hard work, José and Christian Daes have achieved reputations for excellence in the business community. Indeed, *Fortune Magazine* ranked Tecnoglass as the 27th fastest-growing company in the United States for 2024 based on Tecnoglass's strong revenue growth, earnings per share growth, and three-year annualized return to shareholders for the period ended June 30, 2024.

21. José and Christian Daes are also known for their philanthropic contributions. Under their leadership, Tecnoglass has sponsored the Tecnoglass ES Windows Foundation, which has allocated resources to initiate and support various regional development projects. In 2025, the foundation's scholarship program allowed over 500 students to pursue higher education at Colombian universities. The foundation has also supported local educational entities and organizations pursuing societal change and community enhancement. The foundation's home improvement program has supported the ability of Tecnoglass group employees to enhance their homes or purchase their own, ensuring the well-being of their families. During 2025, the foundation delivered more than 110 housing improvements.

## B. Culper Research's History Of Profiteering From Defamation

22. Upon information and belief, Defendant Lamarco founded Defendant Shadyside Partners, LLC (d/b/a Culper Research) in 2019, two years after he obtained an undergraduate degree in finance from Grove City College and without substantial work experience.

23. Defendants' website, www.culperresearch.com, holds Culper Research out as a firm that specializes in investigative reporting, stating, "we take an exhaustive, investigative approach to investment research," and "[w]e seek to expose companies which have misrepresented their operations, failed to disclose significant risks, misused capital, possess accounting irregularities, or otherwise deceived investors."

24. Under the brand of Culper Research, Defendants author and publish reports that they make available on the Culper Research website, www.culperresearch.com, under the heading, "Latest Research." Upon information and belief, since its founding, Culper Research has issued ten or fewer so-called research reports per year, targeting a small number of public companies in which Defendants have taken a "short" position, meaning that they have engaged in an investment strategy such that they stood to make a **profit** if the company's stock value **declined**.

25. Upon information and belief, Defendants write the reports made available on the Culper Research website with the goal that the report will cause the price in the stock of the company that is the subject of the report to drop so that Defendants can make a profit.

26. Upon information and belief, Lamarco is the sole member and owner of Shadyside Partners, LLC d/b/a Culper Research, and Culper Research has no other employees.

27. Notwithstanding the apparent absence of other members or employees, Defendants have held Culper Research out as if it is an established investment research organization and not a one-man operation. For example, since its founding in 2019, reports issued by Culper Research have characteristically referred to "we" in describing Culper Research's findings, such as in describing what "we" have found. The public profile for Culper Research's account on the social media platform X, @CulperResearch, has also historically referred to "we" in describing Culper Research's activity. Upon information and belief, Defendant Lamarco began referring to "we" in

describing his work under the Culper Research brand in order to falsely position the company and its short reports as more credible than those written by someone who was just two years out of college with no substantial real world working experience, which is who Lamarco was at the time he founded Culper Research. In reality, the "we" at Culper Research is, upon information and belief, really just Lamarco.

28. Defendants—under the guise of Culper Research—have openly bragged about the damage that the claims in their reports have caused to public companies. For example, the public profile for Culper Research's account on X includes the below post, dated February 14, 2024, in which Defendants appear to take credit for the vast decline in stock value of three different public companies that have been the subject of Culper Research's reports, and warning that its next target would "also end[] in shambles":


Culper @CulperResearch · Feb 14, 2024

We've already written about 3 biotech companies:

$CYDY - down 88% while former execs now face SEC & DOJ charges,
$VBIV - down 99% and announced a restructuring, and
$VERU - down 97% as its nonsense COVID promote failed as predicted.

Tomorrow, we expose another -- a multi-billion dollar group that has fooled investors thus far, but we think also ends in shambles.

13 11 63 27K

29. The public profile for Culper Research's account on X includes the below post, dated September 27, 2023, in which Defendants similarly took credit for drastic drops in the stock prices of ten different public companies.

**Culper** @CulperResearch · Sep 27, 2023

Tomorrow morning we'll reveal our latest short. As they say, if it sounds too good to be true...

Performance of our last 10 ideas below.

| Ticker | Company Name | Publish Date | Change Since Initiation | Change in S&P 500 | Change vs. S&P 500 |
|---|---|---|---|---|---|
| AMTX | Aemetis, Inc. | Jul-21 | -54% | -3% | 51% |
| DATS | DatChat, Inc. | Oct-21 | -97% | -2% | 95% |
| CORZ | Core Scientific, Inc. | Mar-22 | -91% | -3% | 88% |
| VERU | Veru Inc. | May-22 | -93% | 3% | 97% |
| PLL | Piedmont Lithium Inc. | Jun-22 | -24% | 14% | 38% |
| NRGV | Energy Vault Holdings, Inc. | Jul-22 | -61% | 8% | 69% |
| TMCI | Treace Medical Concepts, Inc. | Nov-22 | -50% | 8% | 58% |
| XMTR | Xometry, Inc. | Jan-23 | -44% | 7% | 51% |
| RUM | Rumble Inc. | Apr-23 | -37% | 5% | 42% |
| SOUN | SoundHound AI, Inc. | Jul-23 | -27% | -6% | 20% |

12 15 160 69K

30. In another example, the public profile for Culper Research's account on X includes the below post, dated March 20, 2024, in which Culper Research likens itself to the Grim Reaper, further demonstrating Defendants' extreme ill will toward public companies and their executives and employees—like Plaintiffs—that become subject of Defendants' reports.




31. Defendants have been sued for defamation multiple times, but appear to treat such lawsuits as just a cost of doing business. Each time—in contrast to their usual willingness to publicly take credit for the decline in value of the stocks they target—Defendants cynically argue that the drop in the stock's price was due **not** to their defamatory report but to other market factors.[1]

[1] *E.g.*, *LifeMD, Inc. v. Lamarco*, Case No. 2:21-cv-01273, ECF No. 7 at 5 (W.D. Pa. Oct. 12, 2021) (Lamarco's motion to dismiss stating, "This nearly 60% decline preceded, and therefore had nothing to do with, the publication of the Article"); *Gorilla Technology Group, Inc. v. Shadyside Partners, LLC*, Case No. 1:25-cv-03142, ECF No. 21 at 1 (S.D.N.Y. June 5, 2025) (Lamarco's motion to dismiss stating, "Gorilla's stock price had already plummeted from $44.15 to $18.99 per share – a 57% decline – prior to the Report's publication, whereas the fluctuation following the Report's publication was approximately $2 a share—dramatically less. The idea, as alleged, that Gorilla's troubles were necessarily caused by the Report is simply implausible …").

In at least one other instance, Defendants have published a report attributing serious criminal misconduct to individuals and entities with no basis to back up the allegations.[2]

**C. <u>Public Representations Dispel The Authenticity Of The Fabricated Mexican Intelligence Reports</u>**

32. Despite a public record that thoroughly dispelled the Fabricated Mexican Intelligence Reports' authenticity and the credibility of the allegations therein, including Mexican authorities publicly denying ever issuing, possessing, or having any knowledge of the Fabricated Mexican Intelligence Reports, and including Colombian authorities closing their investigation into the reports' existence and allegations, Defendants resurrected the falsehoods anyway for financial gain.

33. In September 2022, an international group of hackers, called "Guacamaya", purportedly hacked and leaked six terabytes of data from the Mexican Secretariat of National Defense ("SEDENA") to the public. The leak, commonly referred to as the SEDENA or Guacamaya Leaks, was said to have involved internal communications and reports from the Mexican government, as well as documents from other governments, including Chile, Colombia, El Salvador, Guatemala, and Peru.

34. On March 23, 2023, the Office of the President of Mexico issued a public statement, published on its government website and on its official X account, @GobiernoMX, regarding documents circulating following the Guacamaya Leaks.[3] The statement warned that "certain

[2] *See JC Int'l Fin. Ltd., et al. v. Lamarco*, Case No. 1:26-cv-04930, ECF No. 1 (S.D.N.Y. June 10, 2026) (alleging Defendants falsely attributed human trafficking, money laundering, and organized crime ties to Plaintiffs with no supporting evidence in the report itself for those allegations).

[3] Gobierno de México (@GobiernoMX), X (Mar. 23, 2023, 4:42 PM), https://x.com/GobiernoMX/status/1639019922956091392; Press Release, Gobierno de México, *Acciones de inteligencia, orientadas a atender amenazas y riesgos a la seguridad nacional* (Mar. 23, 2023), https://www.gob.mx/amlo/prensa/acciones-de-inteligencia-orientadas-a-atender-

documents that various media outlets have made public, linking them to the cyberattack suffered by the servers of SEDENA are not considered official" and "are not signed, executed, or endorsed by any competent authority." The statement also warned that bad actors could use documents from the Guacamaya Leaks to prepare similar-looking documents that resembled official government reports to damage entities' reputations. This statement and the X post have been publicly available, and were covered by various news organizations, since March 2023—including on August 21, 2025, when Defendants published the Defamatory Report.

35. Then, on October 20, 2023, more than one year after the hack, Mexican outlet Eje Central published an article referencing the Fabricated Mexican Intelligence Reports that the publication claimed were from the Guacamaya Leaks, without any corroborating evidence of the documents' origins. Those documents described an alleged Sinaloa cartel scheme to fund political campaigns. Eje Central's article was republished in Colombia by W Radio on October 23 and 27, 2023, in the final days before Colombia's territorial elections of October 29, 2023, in which Alejandro Char—whose family, and whose family's bank, Banco Serfinanza, were named in the Fabricated Mexican Intelligence Reports—was the leading candidate for mayor of Barranquilla. On October 24, 2023, the President of Colombia—head of the coalition competing in that election—amplified the publication from his official account and ordered the financial regulator to investigate. The Fabricated Mexican Intelligence Reports thus emerged publicly within a local electoral controversy, days before the vote, and not as the result of an independent, documented journalistic disclosure made following the 2022 hack. That contextual red flag was public, indexed, and among the first results of any relevant search, and it demanded heightened caution before

amenazas-y-riesgos-a-la-seguridad-nacional.

Defendants republished the document's allegations nearly two years later as "recently leaked intelligence memos."

36. The Fabricated Mexican Intelligence Reports' October 2023 publication also generated an immediate public record of denials and independent fact-checks, all of which remained online, continuously and indexed, through the date of the Defamatory Report's publication.

37. For example, on October 23, 2023, Banco Serfinanza publicly denied[4] the accusations, including by denying that it handles foreign-currency transactions—a fact that renders the transfer described in the Fabricated Mexican Intelligence Reports materially impossible.

38. On October 24 and 25, 2023, Alejandro Char publicly denounced the accusation as false, defamatory, and an electoral frame-up.[5]

39. And, on October 25, 2023, the Colombian fact-checking outlet El Expediente concluded that the accusation was unfounded because the publishing outlet presented no evidence or testimony in support of it, and noted that Eje Central claimed to possess the Fabricated Mexican Intelligence Reports but had neither displayed nor quoted them.[6]

[4] *See, e.g.*, Javier Acosta, *Banco Serfinanza niega vínculos con el cartel de Sinaloa*, Portafolio (Oct. 24, 2023), https://www.portafolio.co/negocios/empresas/banco-serfinanza-niega-vinculos-con-el-cartel-de-sinaloa-591125.

[5] *See, e.g.*, Leonardo Herrera Delgans, *Álex Char denuncia que enemigos políticos tienen plan para hacer montajes en su contra*, El Tiempo (Oct. 25, 2023), https://www.eltiempo.com/colombia/barranquilla/alejandro-char-denuncia-sobre-montajes-en-elecciones-barranquilla-2023-819523.

[6] *Verificación de hechos: ¿El banco Serfinanza está vinculado con el cartel de Sinaloa? ¿Qué es cierto, tendencioso o falso? Fast check El Expediente*, El Expediente (Oct. 25, 2023), https://elexpediente.co/verificacion-de-hechos-el-banco-serfinanza-esta-vinculado-con-el-cartel-de-sinaloa-que-es-cierto-tendencioso-o-falso-fack-checking-el-expediente/.

40. On October 27, 2023, counsel for the Char family publicly challenged the Fabricated Mexican Intelligence Reports' authenticity and identified specific methodological anomalies in the documents.[7]

41. Public scrutiny of the Fabricated Mexican Intelligence Reports continued into the following year when, on February 17, 2024, Semana, one of Colombia's highest-circulation media outlets, published an article titled "Autoridades mexicanas niegan investigación o vínculo de Serfinanza con actividad ilícita tras acción de amparo" ("Mexican authorities deny any investigation or link between Serfinanza and unlawful activity following amparo action").[8] The article published portions of a sworn justified report (the "Justified Report")—a report Mexican authorities are legally required to submit when responding to a challenged act in court—filed by Mexico's Secretariat of National Defense which stated that the Secretariat had no knowledge of the Fabricated Mexican Intelligence Reports or their origin. The Secretariat also swore in the Justified Report that the Fabricated Mexican Intelligence Reports were not official documents and the Secretariat had not produced them. This article remains publicly available online.

42. The Secretariat of National Defense's Justified Report, described in the Semana article above, was filed on December 29, 2023 in a constitutional proceeding (amparo indirecto 2135/2023) that Banco Serfinanza initiated before a Mexican federal court to obtain a judicial determination that the Fabricated Mexican Intelligence Reports were not authentic (the "Amparo

---

[7] *See, e.g.*, *"No le damos credibilidad": abogado de los Char sobre el documento que vincula al clan con el cartel de Sinaloa*, Cambio Colombia (Oct. 27, 2023), https://cambiocolombia.com/poder/articulo/2023/10/no-le-damos-credibilidad-abogado-de-los-char-sobre-el-documento-que-vincula-al-clan-con-el.

[8] *Autoridades mexicanas niegan investigación o vínculo de Serfinanza con actividad ilícita tras acción de amparo*, Semana (Feb. 17, 2024), https://www.semana.com/nacion/articulo/autoridades-mexicanas-niegan-investigacion-o-vinculo-de-serfinanza-con-actividad-ilicita-tras-accion-de-amparo/202457/.

Proceeding”). In the Amparo Proceeding, multiple other Mexican governmental authorities, including the Secretariat of Foreign Affairs, the Financial Intelligence Unit, the Mexican Embassy in Colombia, and the Military and Air Attaché Office of the Embassy of Mexico in Colombia, submitted sworn justified reports categorically denying that they issued, possessed, or had any knowledge of the Fabricated Mexican Intelligence Reports. In a justified report filed on July 3, 2024, the Military and Air Attaché Office—the very office to which the Fabricated Mexican Intelligence Reports attribute their own authorship—categorically denied having issued the documents, certifying that (i) there is no Infantry Colonel with a General Staff Diploma assigned to the Embassy of Mexico in Colombia, such that the position of the documents’ apparent signatory does not exist at that diplomatic mission; (ii) the documents “were not located, either physically or by reference in any document,” and therefore do not correspond to information prepared at that office; and (iii) that office does not use the abbreviation “COL” in its standardized numbering—precisely the numbering that appears on the face of the Fabricated Mexican Intelligence Reports. In total, in the Amparo Proceeding, eight Mexican governmental authorities—among them the very office to which the Fabricated Mexican Intelligence Reports attribute their own authorship—categorically denied, under institutional responsibility and within a judicial record, having issued, received, or had any knowledge of the Fabricated Mexican Intelligence Reports. On November 19, 2024, the Mexican federal court dismissed the Amparo Proceeding upon concluding that there was no evidence rebutting the authorities’ sworn denials.

43. Following the Fabricated Mexican Intelligence Reports’ circulation, the Office of the Attorney General of Colombia (Fiscalía General de la Nación) opened a criminal case concerning the allegations that those named in the documents had ties to Mexican criminal organizations. The investigation concluded, on July 30, 2024, that no evidence supported the

Fabricated Mexican Intelligence Reports' allegations. Specifically, the Attorney General's Office found no evidence that the Fabricated Mexican Intelligence Reports were authentic or that the reports' allegations of purported cartel ties and a money laundering scheme were true. On July 30, 2024, the Attorney General's Office ordered the archival of the proceedings pursuant to Article 79 of the Colombian Code of Criminal Procedure on the ground of the non-existence of the act under investigation (archivo por inexistencia del hecho). This archival order, and the case's status—recorded as inactive and archived for non-existence of the act as of August 1, 2024—have remained publicly available and verifiable on the Attorney General's free, public case-lookup portal continuously from that date to today, including on August 21, 2025 when Defendants published the Defamatory Report.

## D. Defendants Seek To Profit From Spreading Falsehoods About Plaintiffs

44. On August 21, 2025, Defendants targeted Tecnoglass and its leadership, authoring and publishing a premeditated defamatory report titled, "Tecnoglass (TGLS): From Barranquilla to Sinaloa," which Defendants made publicly available on the Culper Research website, www.culperresearch.com (the "Defamatory Report") and promoted on the public profile page of the X account for Culper Research, @CulperResearch.

45. Defendants publicly refer to the Defamatory Report as "research," for instance, by making it available on a portion of the www.culperresearch.com website titled "Latest Research." The Defamatory Report then begins with a statement, labeled a "disclaimer," stating, among other things, "[t]o the best of our ability and belief, **all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable**" (emphasis added).

46. The Defamatory Report includes numerous false and defamatory statements of and concerning Plaintiffs including—among others—statements conveying the false assertion that

Plaintiffs are involved in the illegal activities of the Sinaloa cartel, which the Defamatory Report describes as a "major drug cartel[]" that President Trump directed the State Department to designate as a "terrorist organization[]." The Defamatory Report also relied on, and re-published, the previously-debunked Fabricated Mexican Intelligence Reports.

47. For example, the Defamatory Report includes the following false and defamatory statements of and concerning Plaintiffs (herein together the "Defamatory Report Statements"):

- "Tecnoglass CEO & COO José & Christian Daes Alleged to Aid Sinaloa Cartel Illicit Financing Schemes, According to Recently Leaked Intelligence Memos."
- "We are short Tecnoglass Inc. ('TGLS', 'the Company') because we uncovered new evidence that links Tecnoglass insiders – including its CEO and COO José and Christian Daes – to Sinaloa cartel operations in Colombia. In late 2022 and 2023, Mexican hackers leaked a cache of Mexican intelligence reports which detailed the Sinaloa cartel's 'illicit financing of the presidential campaign of the Republic of Colombia.' The leaked documents were meant to be redacted, but by simply highlighting, copying, and pasting the 'redacted' text, we found **that Tecnoglass brothers José and Christian Daes were** named explicitly as two of the eight businessmen who allegedly participated in this **scheme**" (original emphasis).
- "In what follows, we detail new, previously unreported evidence that we believe ties Tecnoglass and the Daes brothers to the infamous Sinaloa cartel and widespread corruption along Colombia's Caribbean coast."
- "Tecnoglass Executives José and Christian Daes Named by Mexican Intelligence as Involved in Sinaloa Cartel Election Scheme."

- "In late 2022 and 2023, Mexican hackers leaked six terabytes of data from Mexican military and defense agencies, initially published by Colombia's leading news radio network, W Radio. The Mexican government confirmed the leaks, now referred to as the 'Guacamaya Leaks.' … The intelligence reports detailed various aspects [of] the Sinaloa Cartel's criminal operations inside of Colombia, including their 'infiltrating the financial and political system' via 'illicit financing' schemes, resulting in the cartel seizing 'consolidated control of at least three of Colombia's main ports: Cartagena, Barranquilla, and Santa Marta. Recall that Tecnoglass is headquartered in Barranquilla, and most of its product flows through the Barranquilla port, according to import/export records. More particularly, the memos described: … A 'back-to-back' scheme whereby, in short, Sinaloa cartel funds would be funneled to politicians as loans, and the debt from the politician would be repaid on their behalf by Barranquilla businessmen, **<u>including José and Christian Daes, utilizing the proceeds of corrupt contract awards</u>**" (original emphasis).

48. This "new" and "uncovered" evidence Defendants reference in the Defamatory Report are the Fabricated Mexican Intelligence Reports, which, as explained above, circulated first in 2023 and, in the eighteen months before Defendants published the Defamatory Report, had already been found to be inauthentic by multiple Mexican authorities, while Colombian authorities separately found no evidence supporting the allegations within them. Upon information and belief, Defendants intentionally omitted all of this public information from the Defamatory Report to purposefully mislead readers that the Fabricated Mexican Intelligence Reports were authentic.

49. Also on August 21, 2025—the same day that Defendants published the Defamatory Report to the Culper Research website—Defendants posted the following false and defamatory statement to the public profile for the Culper Research account on X, @CulperResearch, accompanied by a hyperlink to the Defamatory Report on the Culper Research website: "NEW: We are short Tecnoglass $TGLS - recently leaked intelligence memos name $TGLS CEO and COO José and Christian Daes as participants in Sinaloa cartel schemes in Colombia; $TGLS board also ensnared; massive fallout risk ignored." The same day, Defendants published a follow-up reply comment to the aforementioned post on the Culper Research account on X, which was also accessible from the account's public profile page and displayed alongside the aforementioned statement, falsely stating: "3) In 2022-23, hackers leaked a cache of Mexican intelligence docs, in which officials allege Sinaloa-funded Colombian election schemes. The docs were poorly redacted - our simple copy/paste reveals $TGLS execs José and Christian Daes were called out by name as participants." These two statements are referenced together herein as the "Defamatory X Posts."

50. The Defamatory Report Statements and the Defamatory X Posts are reasonably understood by readers to convey the assertion that Tecnoglass, José Daes, and Christian Daes are connected to and involved with a drug cartel, specifically the Sinaloa cartel, and have participated in its alleged illegal operations, including an alleged illegal election finance scheme and other acts of corruption; and that a report of a Mexican government intelligence unit tied Plaintiffs to the Sinaloa cartel and its alleged illegal election finance scheme. Moreover, readers reasonably understood Defendants to be conveying factual assertions by such statements, particularly given that the Defamatory Report begins at the outset by stating that "all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable." Defendants, having professed to hold themselves to an "exhaustive, investigative"

standard and to publish only what was "accurate and reliable," carried a responsibility to readers. They abandoned that responsibility: Defendants published the Defamatory Report Statements and Defamatory X Posts while ignoring a public record that had already discredited the very documents those statements rely on.

51. The Defamatory Report Statements and the Defamatory X Posts are false in multiple respects. First, Tecnoglass, José Daes, and Christian Daes are not, and never have been, connected to or involved in any way with, the Sinaloa cartel or its operations. More specifically, Plaintiffs have never been involved with any alleged illegal election finance scheme or other acts of unlawfulness or corruption involving the Sinaloa cartel. Second, Defendants' statements are further false because the Fabricated Mexican Intelligence Reports, as stated above, do not reflect any actual statements or conclusions by the Mexican government or any official or intelligence unit within the Mexican government. The Mexican government has publicly and unequivocally made clear as early as February 2024, eighteen months before the Defamatory Report's publication, that the Fabricated Mexican Intelligence Reports are fictitious.

52. Defendants nonetheless represented the Fabricated Mexican Intelligence Reports as if they were real, describing them in the Defamatory Report as part of "a cache of Mexican intelligence reports" that were leaked by "Mexican hackers." The Defamatory Report further states, "The Mexican government confirmed the leaks, now referred to as the 'Guacamaya Leaks.'"

53. By asserting that the "Mexican government confirmed the leaks," Defendants expressly misled their readers to believe that the Fabricated Mexican Intelligence Reports, specifically, were authentic and part of the recognized hack and resulting leak. In fact, Defendants cited no source connecting the Fabricated Mexican Intelligence Reports to the Guacamaya Leaks.

Instead, Defendants misleadingly placed the phrase "government confirmed the leaks" directly before their description of the Fabricated Mexican Intelligence Reports, so that readers would believe that the Fabricated Mexican Intelligence Reports were somehow authentic or government-confirmed. By characterizing the Fabricated Mexican Intelligence Reports as government-confirmed, Defendants represented the fabricated documents as a finding backed by Mexican authorities. As discussed above and as was publicly available when Defendants issued the Defamatory Report, the office to which the Fabricated Mexican Intelligence Reports attribute their own authorship has certified, following a search of its records, that the documents were not located "either physically or by reference in any document." Documents that never existed as institutional communications could not have been on SEDENA's servers, and documents that were never on those servers could not have formed part of the leak.

54. Defendants' "disclaimer" at the start of the Defamatory Report—in which they state "all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable"—likewise served to communicate Defendants' endorsement of the Fabricated Mexican Intelligence Reports as authentic and genuine government documents. By representing that the information in the Defamatory Report was "accurate and reliable" and "obtained from public sources [Defendants] believe to be accurate and reliable," Defendants held themselves out as employing a heightened standard of care in verifying the veracity of the Defamatory Report's claims. Instead, despite this express representation, Defendants disregarded even minimal diligence into the Fabricated Mexican Intelligence Reports' authenticity and purposefully misled readers as a result.

55. Upon information and belief, Defendants privately entertained serious doubts as to the authenticity of the Fabricated Mexican Intelligence Reports prior to publishing the Defamatory

Report, or, at minimum, published the Defamatory Report with a high degree of awareness of its probable falsity. Despite these doubts, Defendants publicly endorsed the documents' authenticity without taking any steps to confirm whether the Fabricated Mexican Intelligence Reports were real. Even accepting Defendants' own characterization of the Fabricated Mexican Intelligence Reports' origin, Defendants' reliance on them should be heavily scrutinized. In the Defamatory Report, Defendants linked a Wikipedia entry for "Guacamaya (hacktivist group)", which describes the group as "an international group of hackers that has published anonymous reports and leaked sensitive files" and "hacked major corporations and the governments of Chile, Colombia, El Salvador, Guatemala, Mexico, and Peru." The Wikipedia entry further notes that the group "says they're motivated by anti-imperialism and environmentalism, and that they fight against transnational corporations and external intervention in Latin America, singling out extractivism and the armed forces and the defense of natural resources and native communities.'" Thus, Defendants were aware that the entity that they claimed to be the source of the Fabricated Mexican Intelligence Reports was an anonymous criminal outlet that had taken credit for extensive criminal acts committed in the name of an activist agenda by obtaining documents through illegal hacking and damaging their subjects through public disclosure.

56. The Fabricated Mexican Intelligence Reports also bear facial abnormalities which, on information and belief, caused Defendants to have concerns regarding the documents' authenticity and were apparent to Defendants at the time of publication.

57. Defendants acknowledge in the Defamatory Report that the purportedly redacted text of the Fabricated Mexican Intelligence Reports, which is where José and Christian Daes's names appeared, was visible to them after highlighting, copying, and pasting that text into another document. Of course, the ability to circumvent redactions on a purported intelligence document is

a clear red flag that, on information and belief, put Defendants on notice that the Fabricated Mexican Intelligence Reports were not authentic.

58. The Fabricated Mexican Intelligence Reports contained other facial abnormalities serving as red flags to put Defendants on notice that they were fabricated and inauthentic. For example, the seals on the documents do not match the official Mexican government's coat of arms. The seals are blurry and set abnormally against a gray shadow. The letterheads list country before city, which is the reverse of the convention used in communications from the Mexican government. The documents also use inconsistent formatting, such as differing typefaces in the body text and page-numbering footers, and irregular paragraph alignment. Each of these defects was apparent on the face of the Fabricated Mexican Intelligence Reports and known to Defendants prior to publication of the Defamatory Report.

59. These red flags, together with the public information available to Defendants prior to publication, gave Defendants substantial reason to doubt the veracity and authenticity of the Fabricated Mexican Intelligence Reports. Nonetheless—evincing their purposeful avoidance of the truth—Defendants represented the documents as accurate and reliable without taking any steps to confirm that representation, such as contacting any of the Plaintiffs, which would have revealed Plaintiffs' denial of the allegations. Indeed, as noted in Paragraphs 32-43, information that was publicly available at the time of and leading up to the publication of the Defamatory Report confirmed that the Fabricated Mexican Intelligence Reports were **not** authentic, accurate, or reliable.

60. Defendants' purposeful avoidance of the truth extended into how they characterized the purported link that the Fabricated Mexican Intelligence Reports made from the Sinaloa Cartel to Plaintiffs. Even if the Fabricated Mexican Intelligence Reports were authentic, which they are

not, the documents do not support the conclusion that Defendants drew that Plaintiffs were part of an alleged money laundering scheme connected to the Sinaloa cartel. The Fabricated Mexican Intelligence Reports' cartel allegations are directed at a separate group of named individuals, none of whom are Plaintiffs. By contrast, Plaintiffs are referenced in a list of "businessmen" whom the documents describe as being responsible for repaying a loan through government contract proceeds. Even taking that claim at face value, the Fabricated Mexican Intelligence Reports never say that Plaintiffs had any contact with cartel sources, any knowledge that the money came from the cartel, or any role in cartel activity. Defendants manufactured a link between Plaintiffs and the cartel by turning references to an alleged debt-repayment role into a claim that Plaintiffs "aid[ed]" the cartel's "illicit financing schemes" and were "link[ed] … to Sinaloa cartel operations." Naming individuals in a list of businessmen allegedly repaying a loan does not reasonably support the conclusion that those individuals are part of a drug cartel. That inference was so inherently improbable, and a misrepresentation of the Fabricated Mexican Intelligence Reports' language, that Defendants knew what they were publishing was false, or, at minimum, entertained serious doubts as to its truth. Defendants published the Defamatory Report Statements and Defamatory X Posts as an established fact anyway.

61. The Defamatory Report also relies on President Donald Trump's issuance of Executive Order 14157, which designated cartels including Sinaloa as terrorist organizations and stated that the U.S. Department of Treasury has sanctioned entities and individuals assisting such cartels, to make its allegations appear credible. Yet, Plaintiffs have never appeared on the Treasury's Specially Designated Nationals, or in any sanctions program at all. Defendants could have easily verified this on the government's free, publicly available website prior to publishing the Defamatory Report.

62. The Defamatory Report confirms that Defendants were aware of ongoing disputes over the Fabricated Mexican Intelligence Reports' veracity. The Defamatory Report states that "[f]ollowing the publication of the reports, Colombian President Gustavo Petro ordered the government's financial watchdog to investigate the claims," and that "Banco Serfinanza denied the accusations"—citing sources that were nearly two years old at the time of publication. Yet Defendants omitted that, by the time of publication, the Colombian Attorney General's Office had completed its investigation and concluded there was no evidence supporting the Fabricated Mexican Intelligence Reports' allegations. Defendants likewise omitted that Banco Serfinanza's denial had already been publicly corroborated: since February 17, 2024, Semana's reporting—which has remained publicly available, including on August 21, 2025, when Defendants published the Defamatory Report—had reproduced the sworn justified report in which Mexico's Secretariat of National Defense denied any knowledge of the Fabricated Mexican Intelligence Reports and confirmed that they are not official documents. Defendants' selective citations show that they were aware of facts undermining the Fabricated Mexican Intelligence Reports' authenticity, yet chose to publish them as true regardless.

63. The volume of publicly available information contradicting the Fabricated Mexican Intelligence Reports gave Defendants ample reason to doubt the authenticity of the Fabricated Mexican Intelligence Reports and the allegations within them. Defendants' publication of the Defamatory Report and Defamatory X Posts, notwithstanding the readily available information, reflects their purposeful avoidance of the truth.

64. Upon information and belief, sometime prior to publishing the Defamatory Report, Defendants (whether acting through Shadyside Partners, LLC, individually, or a separate entity) acquired an interest in a financial asset whereby they would obtain a profit in the event that the price

of Tecnoglass shares were to **decrease**. Indeed, the Defamatory Report's preface states, "[w]e are short Tecnoglass Inc.," which is financial industry jargon meaning that Defendants had engaged in an investment strategy such that they would profit if the company's stock price declined, and that Defendants are "likely to immediately transact in these securities." Defendants thus stood to profit directly and immediately from Tecnoglass's share price declining from the Defamatory Report's publication. This financially incentivized Defendants to publish and disseminate information that would harm Tecnoglass's share price so that they could profit from the Defamatory Report. Upon information and belief, Defendants did make a profit from the Defamatory Report when it caused a decline in the Tecnoglass share price right after publication.

65. On August 26, 2025, counsel for Plaintiffs wrote Defendants a letter informing them, among other things, that the Defamatory Report's statements accusing Plaintiffs of being involved in the Sinaloa cartel's alleged illegal campaign finance scheme, or any other aspect of the Sinaloa cartel, were false, and demanding that Defendants issue a retraction. As part of that letter, Plaintiffs' counsel provided Defendants with the November 19, 2024 decision of the Mexican federal court described above (and a corresponding English translation), reflecting the judicial record in which eight Mexican governmental authorities—including the very office to which the Fabricated Mexican Intelligence Reports attribute their own authorship—categorically denied, in sworn justified reports, having issued, received, or had any knowledge of the Fabricated Mexican Intelligence Reports and confirmed that they are not official documents.

66. After receiving Plaintiffs' demand for a retraction and evidence demonstrating that the Fabricated Mexican Intelligence Reports were fake, Defendants refused to issue a retraction and continued to make the Defamatory Report Statements and Defamatory X Posts publicly available online. That same judicial record that Plaintiffs shared with Defendants was further

publicized in subsequent reporting on September 4, 2025 and onwards. Defendants' blatant refusal to retract their Defamatory Report Statements and Defamatory X Posts, in the face of both Plaintiffs' demand and a public record that preceded and followed after the Defamatory Report's publication, further evidences Defendants' purposeful avoidance of the truth and financial motivations for defaming Plaintiffs.

67. The damage to Plaintiffs' reputation is substantial and continues to this day. The Defamatory Report Statements and Defamatory X Posts have falsely stated that Tecnoglass, José Daes, and Christian Daes are tied to a major international drug trafficking and money laundering operation. They do so by publishing fraudulent documents and allegations previously debunked, misstating important facts, and harming the goodwill Plaintiffs have formed with customers and investors.

68. Plaintiffs have additionally incurred expenses reasonably necessary to counteract Defendants' Defamatory Report Statements and Defamatory X Posts, including legal fees incurred to refute the false statements described above and clear Plaintiffs' name. Additionally, Tecnoglass employees and management, including Plaintiffs José Daes and Christian Daes, have diverted from their ordinary responsibilities in order to respond to the falsehoods published in the Defamatory Report Statements and Defamatory X Posts. Plaintiffs continue to incur these costs through to today.

## **FIRST CAUSE OF ACTION**

Defamation

(On Behalf Of Each Plaintiff Against Each Defendant)

69. Plaintiffs repeat, re-allege, and incorporate by reference the allegations in Paragraphs 1-68 as if set forth fully herein.

70. On August 21, 2025, Defendants published or caused to be published the Defamatory Report Statements to the publicly-accessible Culper Research website,

www.culperresearch.com, and published or caused to be published the Defamatory X Posts to the publicly-accessible profile page for Culper Research on X, @CulperResearch, both of which contained unprivileged false assertions of fact of and concerning Plaintiffs Tecnoglass, José Daes, and Christian Daes.

71. The Defamatory Report Statements and the Defamatory X Posts are defamatory per se because they impute serious criminal misconduct to the Plaintiffs, injure them in their trade or profession, and describe conduct, characteristics or condition incompatible with the proper exercise of a lawful business, trade, or profession, and otherwise subject Plaintiffs to hatred, distrust, ridicule, contempt, or disgrace.

72. No reasonable person under the circumstances would have published the Defamatory Report Statements and the Defamatory X Posts.

73. Defendants published or caused to be published the Defamatory Report Statements and the Defamatory X Posts negligently and/or with knowledge that they were false and/or with reckless disregard for the truth or falsity of the Defamatory Report Statements and the Defamatory X Posts. In particular, the facts alleged above establish—by clear and convincing evidence—that Defendants acted with actual malice: Defendants subjectively entertained serious doubts as to the authenticity of the Fabricated Mexican Intelligence Reports upon which the Defamatory Report Statements and the Defamatory X Posts rely; they themselves discovered, described, and then inverted the significance of the indicia of fabrication on the face of the documents, including the defeat of their purported redactions by simple copy-and-paste; they relied on an anonymous, unverifiable attribution to the Guacamaya Leaks while supplying no provenance, traceability, or chain-of-custody information; and they purposefully avoided including readily available public sources—including the March 23, 2023 statement of the Office of the President of Mexico warning

of apocryphal documents, the October 2023 electoral provenance of the documents and the contemporaneous public denials and fact-checks, Semana's February 17, 2024 publication of SEDENA's sworn denial, the publicly recorded archival of the Colombian criminal investigation for non-existence of the act, and OFAC's free, publicly searchable sanctions database—each of which contradicted the Defamatory Report Statements and the Defamatory X Posts.

74. Upon information and belief, Defendants published or caused to be published the Defamatory Report Statements and the Defamatory X Posts with the specific intent to cause harm to Plaintiffs, showing willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which raises the presumption of conscious indifference to consequences, justifying an award of punitive damages.

75. As a direct and proximate result of the Defamatory Report Statements and the Defamatory X Posts, Plaintiffs have suffered presumed, actual, and special damages, including humiliation, damage to reputation, lost business opportunities, and other pecuniary damage.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Tecnoglass Inc., José Daes, and Christian Daes respectfully request that the Court enter judgment and relief in their favor, and against Defendants, as follows:

A. Award Plaintiffs compensatory, actual, and presumed damages in amounts to be proven at trial;

B. Award Plaintiffs presumed and special damages in amounts to be proven at trial;

C. Award Plaintiffs punitive and/or exemplary damages in an amount to be proven at trial;

D. Award Plaintiffs their reasonable expenses, including but not limited to reasonable costs and attorneys' fees incurred to mitigate the harm caused by Defendants' defamatory and tortious conduct, including without limitation the fees incurred in seeking retraction of Defendants' false and defamatory statements and money spent on efforts to

counteract the negative impact of Defendants' defamatory statements on Plaintiffs' reputations;

E. Award Plaintiffs their reasonable costs and attorneys' fees incurred in bringing this action to restore their reputations;

F. Issue a narrowly-tailored injunction that (i) requires Defendants to remove and retract all of the Defamatory Report Statements and Defamatory X Posts that are adjudicated by this Court to be defamatory and (ii) prohibits Defendants from repeating and republishing all such statements.

G. Award Plaintiffs all costs, disbursements, fees, and pre- and post-judgment interest as permitted by law;

H. Award Plaintiffs such and other additional remedies as the Court deems just and proper.

## **JURY TRIAL DEMAND**

Plaintiffs Tecnoglass Inc., José Daes, and Christian Daes demand a jury trial pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all claims and issues so triable.

Respectfully submitted,

Dated: New York, New York
August 17, 2026

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By: /s/ Alex Spiro

Alex Spiro
Hope D. Skibitsky
Michael R. Bloom
295 Fifth Avenue
New York, New York 10016
Tel: (212) 849–7000
Email: alexspiro@quinnemanuel.com
hopeskibitsky@quinnemanuel.com
michaelbloom@quinnemanuel.com

*Attorneys for Tecnoglass Inc., José Daes, and Christian Daes*