**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

TECNOGLASS HOLDINGS INC., JOSÉ DAES, AND CHRISTIAN DAES,

*Plaintiffs*,

v.

CHRISTIAN LAMARCO and SHADYSIDE PARTNERS, LLC,

*Defendants*.

CIVIL ACTION NO.: 1:26-CV-06986-PAE

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND FOR DEFENDANTS' ATTORNEY'S FEES AND COSTS**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................ 1

STATEMENT OF FACTS ........................................................ 3

LEGAL STANDARD ........................................................ 7

ARGUMENT ........................................................ 8

I. PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED DEFAMATION ........................ 8

A. Plaintiffs Have Not Alleged that the Challenged Statements are False ........................ 8

B. In the Alternative, The Challenged Statements are Not Actionable Because They are Protected Opinion ........................ 12

C. Plaintiffs Have Not Plausibly Alleged Actual Malice ........................ 16

D. Culper is Entitled to its Fees Under New York's Anti-SLAPP Law ........................ 25

CONCLUSION ........................................................ 25

CERTIFICATE OF SERVICE ........................................................ 27

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*1st Amendment Praetorian v. New York Times Co.*,
2025 WL 949575 (S.D.N.Y. Mar. 28, 2025) ....................16, 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ....................7

*Biro v. Conde Nast*,
807 F.3d 541 (2d Cir. 2015) ....................7

*Biro v. Conde Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015)
....................8, 16, 18, 25

*Bloom v. A360 Media LLC*,
735 F. Supp. 3d 466 (S.D.N.Y. 2024) ....................7, 17, 24

*Bobulinksi v. Tarlov*,
758 F. Supp. 3d 166 (S.D.N.Y. 2024) ....................25

*Brian v. Richardson*,
87 N.Y.2d 46 (1995) ....................14

*BYD Co. Ltd. v. VICE Media LLC*,
531 F. Supp. 3d 810 (S.D.N.Y. 2021) ....................12

*Cabello-Rondon v. Dow Jones & Co., Inc.*,
2017 WL 3531551 (S.D.N.Y. Aug. 16, 2017), *aff'd*, 720 F. App'x 87 (2d Cir. 2018) ....................18

*Cassava Sciences., Inc. v. Bredt*,
2024 WL 555484 (S.D.N.Y. Jan. 3, 2024) ....................13, 14, 15, 24

*Consortium for Indep. Journalism, Inc. v. United States*,
2025 WL 919504 (S.D.N.Y. Mar. 26, 2025) ....................13, 14

*Cortes v. Twenty-First Century Fox Am., Inc.*,
285 F. Supp. 3d 629 (S.D.N.Y.), *aff'd*, 751 F. App'x 69 (2d Cir. 2018) ....................8, 10

*Dawson v. Merck & Co.*,
2021 WL 242148 (E.D.N.Y. Jan. 24, 2021) ....................22

*Dfinity Found. v. New York Times Co.*,
2024 WL 3565762 (2d Cir. July 29, 2024) ........16

*Dfinity Found. v. New York Times Co.*,
702 F. Supp. 3d 167 (S.D.N.Y. 2023), *aff'd*, 2024 WL 3565762 (2d Cir. July 29, 2024) ........9, 16, 21

*Eros Int'l PLC v. Mangrove Partners*,
140 N.Y.S.3d 518 (1st Dep't 2021) ........14

*Eros Int'l. PLC v. Mangrove Partners*,
2019 WL 1129196 (Sup. Ct. N.Y. Cnty. Mar. 8, 2019), *aff'd*, 191 A.D.3d 465 (1st Dep't 2021) ........14

*Gross v. N.Y. Times Co.*,
82 N.Y.2d 146 (1993) ........13

*Hakimi v. Guidant Global*,
2023 WL 8005321 (S.D.N.Y. Nov. 17, 2023) ........7

*Harris v. City of Seattle*,
152 F. App'x 565 (9th Cir. 2005) ........18

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989) ........18, 19, 24

*Henry v. Fox News Network LLC*,
629 F. Supp. 3d 136 (S.D.N.Y. 2022) ........8, 10

*I.S. Sahni, Inc. v. Scirocco Fin. Grp., Inc.*,
2005 WL 2414762 (S.D.N.Y. Sept. 28, 2005) ........23

*Jacob v. Lorenz*,
626 F. Supp. 3d 672 (S.D.N.Y. 2022) ........19, 23

*Liberman v. Gelstein*,
80 N.Y.2d 429 (1992) ........17

*McIntosh v. Katapult Holdings, Inc.*,
2023 WL 5049044 (S.D.N.Y. Aug. 8, 2023) ........22

*MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*,
2018 WL 4735717 (S.D.N.Y. Sept. 29, 2018) ........18, 24

*Parks v. Steinbrenner*,
131 A.D.2d 60 (1st Dep't 1987) ........14

*Rapaport v. Barstool Sports Inc.*,
2024 WL 88636 (2d Cir. Jan. 9, 2024) ....................14

*Silvercorp Metals Inc. v. Anthion Mgmt. LLC*,
36 Misc.3d 1231(A), (Sup. Ct. 2012) ....................15

*St. Amant v. Thompson*,
390 U.S. 727 (1968)....................16

*Steinhilber v. Alphonse*,
68 N.Y.2d 283 (1986) ....................13

*SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.*,
2022 WL 493600 (S.D.N.Y. Feb. 17, 2022)....................8

*Tannerite Sports, LLC v. NBCUniversal News Grp.*,
864 F.3d 236 (2d Cir. 2017)....................8

*United States v. Maxwell*,
2026 WL 279487 (S.D.N.Y. Feb. 3, 2026)....................22

*Wang v. Sussman*,
Nos. 25-2487-cv, 25-2503-cv ....................25

**Statutes**

N.Y. Civ. Rights Law § 70-a(1)(a) ....................1, 25

N.Y. Civ. Rights Law § 76-a ....................16

**Other Authorities**

DOJ, *WikiLeaks Founder Pleads Guilty and Is Sentenced for Conspiring to Obtain and Disclose Classified National Defense Information* (June 25, 2024), https://www.justice.gov/archives/opa/pr/wikileaks-founder-pleads-guilty-and-sentenced-conspiring-obtain-and-disclose-classified (last visited Sept. 21, 2026) ....................23

Executive Order 14157 ....................11, 12

Federal Rule of Civil Procedure 12(b)(6) ....................1, 7, 25

Gobierno de México, *Relaciones Exteriores*, https://www.gob.mx/sre (last accessed September 21, 2026) ....................23

Defendants Shadyside Partners, LLC d/b/a Culper Research and Christian Lamarco (collectively, "**Culper**") hereby respectfully file this memorandum of law in support of their Motion to Dismiss the Complaint filed by Plaintiffs José and Christian Daes (collectively, "**Daes Brothers**") and Tecnoglass Holdings, Inc. ("**Tecnoglass**" and, with the Daes Brothers, "**Plaintiffs**"), pursuant to Federal Rule of Civil Procedure 12(b)(6), and for an award of Defendants' attorney's fees and costs pursuant to N.Y. Civ. Rights Law § 70-a(1)(a).

## PRELIMINARY STATEMENT

Culper is an activist short-seller; it publishes research reports in which it opines about matters of concern for shareholders of publicly-traded companies. The reports detail Culper's concerns, supported with extensive citations and links to the basis for those concerns. On the basis of these disclosed facts, readers can decide whether or not they agree with Culper's conclusions. When Culper has a short position in a company, it always prominently discloses that fact at the start of each report.

This case stems from an August 21, 2025, Culper Research report in which Culper conveyed concerns about Tecnoglass, a public company that manufactures architectural glass and related products (the "**Report**" or "**Rep.**"). In the Report, Culper disclosed that it was short Tecnoglass stock based on numerous factors, including but not limited to its concerns regarding Tecnoglass governance, including the Daes Brothers' (Tecnoglass' founders and insiders) alleged ties to cartel activity and various additional forms of corruption, the company's acquisitions, fundamental growth, the fact that the Daes Brothers themselves had been continually selling *their own shares* in the company, and what Culper viewed as the company's inflated valuation. The Report included thirty-five pages of analysis to those ends—including numerous public sources, extensively detailed and linked in the Report. These sources include, among many other things, a memo that came to light as part of a reported 2022 hacking of Mexican intelligence documents

(the "**Hacked Memo**"). The Hacked Memo was partially redacted, but detailed an alleged illegal campaign financing scheme, and named the Daes Brothers as participants in this scheme. Culper discovered that when it highlighted the Memo's "redacted" text, it could read the redacted text, leading to the discovery that the Daes Brothers had been named in this Memo.

While the Report details Culper's many concerns with Tecnoglass, Plaintiffs now challenge only one as defamatory. They argue that the Report falsely claimed that "the Daes brothers were involved with the operations of the Sinaloa cartel" (Compl. ¶ 3) and that "Mexican government intelligence had determined the Daes brothers were involved with the Sinaloa cartel's illegal campaign finance scheme." *Id.* ¶ 4. But the Report made no such claims.

Plaintiffs know this because none of the ***actual statements*** that they allege as "Defamatory Report Statements" in Paragraph 47 are statements that the Report made. Instead, the Report merely recites what was "***alleged***" in the Memo about the Daes Brothers "according to recently leaked intelligence memos" and what "the memos described." Plaintiffs do not dispute—nor could they—that the Hacked Memo explicitly named the Daes Brothers. Plaintiffs nowhere allege that any of the Report's *actual statements* are false. This is fatal to Plaintiffs' defamation claim.

Plaintiffs unsuccessfully attempt to sidestep this fatality by falsely claiming that the Hacked Memo was not authentic and that the Report states otherwise. This both mischaracterizes the Report and, in any event, does not salvage Plaintiffs' defamation claim. Notwithstanding that the basis for Plaintiffs' claims that the document was fabricated is pure conjecture, the authenticity of the Hacked Memo is beside the point; rather, it is the fact that the Daes Brothers are indisputably named in the Memo—authentic or not—that was cause for Culper's concern. But even if the Court were to accept that the Report somehow adopted the authenticity of the Hacked Memo (which the Court should not do), any such conclusion drawn by Culper would be protected pure opinion

because the Report discloses the factual bases for its resulting views.

In any event, Plaintiffs have also failed to plead that Culper acted with actual malice, which would have required them to plead that Culper acted with knowledge that what it was saying was false or with reckless disregard to the truth. The "actual malice" requirement is steep and deliberately so when it comes to matters of public interest. Here, the Report disclosed extensive support—none of which Plaintiffs challenge—for Culper's reliance on the Hacked Memo, among numerous other sources, to form its views on Tecnoglass. Moreover, the Report disclosed extensive ***independent*** facts corroborating Plaintiffs' alleged ties to cartel activity, election rigging, and public corruption. In other words, the Hacked Memo made allegations about Plaintiffs that were entirely consistent with allegations made about Plaintiffs by multiple independent sources. As described in the Report, these independent sources tie Plaintiffs to conduct of the same nature and the same characters discussed in the Hacked Memo. It was thus wholly reasonable for Culper to rely on the Memo in forming its views on Tecnoglass. Critically, Plaintiffs do not allege any of these disclosed facts, or the sources on which they are based, are false. Plaintiffs point to purported "red flags" about the document, but none withstand scrutiny.

For these reasons, as more fully set forth herein, the Court should dismiss Plaintiffs' Complaint with prejudice and award Defendants their fees and costs in bringing this Motion pursuant to New York's anti-SLAPP law.

## STATEMENT OF FACTS

The Daes Brothers, Plaintiffs in this case, are based in the Colombian city of Barranquilla. Rep. at 5, 10-12. They are the heads of one of Colombia's most influential families. *See* Rep. at 10. Among other activities, the Daes Brothers founded Tecnoglass, serve as its CEO and COO and on its board of directors, and, for decades (until 2024, when their share sales took them under 50% ownership), held majority control of Tecnoglass. Compl. ¶¶ 14-16; Rep. at 10.

Culper is an investor and activist short-seller. It conducts research into publicly-traded companies and takes short positions in those companies that it believes are overvalued by the investing public. A company can be "overvalued" for a number of reasons: irrational exuberance, corporate fraud, bad contracts, misleading statements to investors, bad forecasting, and other circumstances that are not relevant here. *See* Rep. at 1. Culper publishes reports about its opinions and discloses that it is taking a short position; its reports include extensive and thorough citations to the facts and circumstances that give rise to Culper's opinions as to why it is short.

On August 21, 2025, Culper issued the Report, disclosing that it was short Tecnoglass for many reasons—the vast majority of which are not challenged here. Culper opined that it was shorting Tecnoglass because: the Daes Brothers had recently made significant sales of their own shares; Culper found what appeared to be undisclosed related party transactions; Culper believed Tecnoglass' fundamental growth story was questionable; and Culper noted that the Daes Brothers were alleged to be connected to cartel operations (relating both to the Sinaloa and Cali cartels). Rep. at 4-5. Throughout the 35-page Report, Culper disclosed facts (with extensive citations) that supported its opinions of Tecnoglass. Plaintiffs do not challenge those opinions.

Of the many disclosed facts and opinions offered in the Report, Plaintiffs challenge just one: the Report's discussion of the Hacked Memo. The Memo came to light as part of a massive 2022 hacking of Mexican intelligence documents and detailed an alleged illegal campaign financing scheme with involvement by the Sinaloa cartel and several Colombian businessman. Rep. at 2-3, 12-13. Culper discovered that by highlighting and copying the redacted portions of the Memo, it could read the text that had been redacted—including the names of the Colombian businessmen. *Id.* When Culper did so, it turned out that the redacted material in the Hacked Memo explicitly named the Daes Brothers "as two of the eight businessmen who ***allegedly*** participated

in [the] scheme." *Id.* at 2, 13 (with screenshot and links to Hacked Memo). Indeed, Plaintiffs concede that the Daes Brothers' names "appeared" in the Hacked Memo. Compl. ¶ 57.

In describing the Hacked Memo, Culper made it perfectly clear that it was only recounting what was ***alleged*** in the Memo. The subtitle at the very beginning of the Report reads: José & Christian Daes "***Alleged*** to Aid Sinaloa Cartel Illicit Financing Schemes, ***According to*** Recently Leaked Intelligence Memos." Rep. at 2 (emphasis added). The Report then explained that the Hacked Memo surfaced after the "Guacamaya Leaks," where hackers accessed and leaked Mexican intelligence reports. *Id.* at 2, 12. The Report then went on to describe multiple additional corroborating details that bear on the legitimacy of the Hacked Memo—*none of which are contested by Plaintiffs*. And Culper set forth extensive facts—supported by hyperlinks to sources—corroborating Plaintiffs' inclusion in the Memo.

First, according to the Hacked Memo, the Sinaloa cartel conducted its illicit campaign financing scheme by controlling the ports of the Colombian city of Barranquilla—the Daes Brothers' home town, the city where Tecnoglass is headquartered and from whose port most of Tecnoglass' product flows. *Id.* at 12 (citing and linking to articles and import/export records).

Second, the Hacked Memo alleged that the scheme was conducted via the Char family and their bank, Banco Serfinanza. Meanwhile, Culper found that the Daes Brothers, as well as multiple additional Tecnoglass insiders and Daes family members, held longstanding ties to both the Char family and Serfinanza. *Id.* at 2-6, 12-17 (citing and linking articles). Indeed, as the Report disclosed, the Char and Daes families are so closely tied that "Colombian media often refers to the longstanding Char and Daes family entanglements as the 'Daescharian Caliphate' or the 'Daes-Char Empire.'" *Id.* at 10 (linking articles). The Report disclosed that Colombian media accused the Daes-Char Empire of illicitly using Banco Serfinanza as its "Laundromat." *Id.* at 4 (linking

article). The Report fully disclosed the basis of these ties between Tecnoglass insiders, Daes family members, Banco Serfinanza, and the Char family. *Id.* at 15-17 (citing and linking to Serfinanza's public filings, LinkedIn and Facebook profiles). The Report also cited various instances in which the Chars found themselves subject to allegations of corruption. *Id.* at 13, 20-22 (linking articles). Plaintiffs dispute none of these facts.

Third, in identifying the alleged participants in the Sinaloa cartel's illicit scheme, the Hacked Memo named the Daes Brothers alongside another individual, Julio Gerlein, an individual that Culper found to be closely linked to the Daes family for at least a decade. *Id.* at 19-22 (linking articles and Facebook profiles). The families have long backed the same political candidates—including Alejandro ("Alex") Char, who, upon his election, awarded both the Daes and Gerlein families public works contracts. *Id.* at 20-22 (citing multiple sources). The Report further described how the Daes and Gerlein families ran Valorcon together, one of Barranquilla's mega-contractors. *Id.* at 19-20 (citing multiple sources). Finally, the Report described media reports of ties between the Gerleins and election rigging. *Id.* at 4, 6, 20 (linking articles). Again, Plaintiffs dispute none of these facts—all of which belie the idea that Culper ought not have relied on the Memo.

Fourth, the Report detailed how the Hacked Memo also named Hector "Yogi Bear" Amaris as a key player in the Sinaloa cartel's scheme. *Id.* at 18-19 (citing and linking to articles, a letter and a press release). The Report then linked media reports describing Amaris as both the Daes Brothers' "partner" and Alex Char's "right hand man." *Id.* The Report noted that Amaris is now cooperating with both U.S. and Colombian criminal authorities and has publicly pledged to expose four different corruption schemes—including vote buying, money laundering, and public works corruption—each scheme also being "linked to the Daescharian network." *Id.* at 4, 18-19, 22-24 (citing and linking articles, letter, press release, and corporate and government filings). Plaintiffs

do not dispute these facts, which formed the basis of Culper's conclusions.

Fifth, the Report disclosed that the Daes Brothers were previously extensively tied to the Cali cartel, as detailed in a 2022 Hindenburg Research report. *Id.* at 4-7, 10-12 (citing and linking to the Hindenburg Report). As summarized in the Report (and detailed in the Hindenburg Report), U.S. prosecutors brought criminal charges against the Daes Brothers as "managers and operators" of the Cali cartel, and the Hindenburg Report identified specific acts of alleged wrongdoing. *Id.*

Based on all of these disclosed (and undisputed) facts—Plaintiffs' historical cartel ties, their prior connections to election rigging and numerous other corruption schemes, their close ties to the other individuals and activities identified in the Hacked Memo who also possess ties to the cartel and election rigging—Culper disclosed that it was short Tecnoglass stock. Rep. at 2-7.

## LEGAL STANDARD

To avoid dismissal, Plaintiffs must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Biro v. Conde Nast,* 807 F.3d 541, 544 (2d Cir. 2015) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). Plaintiff must show "more than a sheer possibility that a defendant has acted unlawfully," not "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. "If plaintiff has 'not nudged [her] claims across the line from conceivable to plausible, [her] complaint must be dismissed.'" *Bloom v. A360 Media LLC,* 735 F. Supp. 3d 466, 471 (S.D.N.Y. 2024) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

"[B]ecause a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage." *Hakimi v. Guidant Global,* 2023 WL 8005321, at *7 (S.D.N.Y. Nov. 17, 2023) (cleaned up). Thus, Rule 12(b)(6) "not only protects against the costs of

meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *Biro v. Conde Nast,* 963 F. Supp. 2d 255, 279 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015). "[C]ourts in this district have repeatedly concluded that there is 'particular value in resolving defamation claims at the pleading stage, so as not to protract litigation through discovery and trial and thereby chill the exercise of constitutionally protected freedoms.'" *SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd.,* 2022 WL 493600, at *4 (S.D.N.Y. Feb. 17, 2022).

## ARGUMENT

## I. PLAINTIFFS HAVE NOT ADEQUATELY ALLEGED DEFAMATION

To state a claim for defamation, a plaintiff must establish five elements: (1) a defamatory factual statement concerning the plaintiff; (2) publication to a third party; (3) fault; (4) falsity of the defamatory statement; and (5) special damages or per se actionability. *Henry v. Fox News Network LLC,* 629 F. Supp. 3d 136, 144 (S.D.N.Y. 2022). Plaintiffs fail to satisfy at least three of these elements, each of which provides an independent ground for dismissal.

### A. Plaintiffs Have Not Alleged that the Challenged Statements are False

A defamation plaintiff must plead the falsity of a statement; falsity is not presumed. *Tannerite Sports, LLC v. NBCUniversal News Grp.,* 864 F.3d 236, 243-44, 247 (2d Cir. 2017). The burden is on Plaintiffs, who must specifically allege falsity; conclusory pleading is not enough. *Henry*, 629 F. Supp. 3d at 146 (Plaintiffs must "plead facts that, if proven, would allow a reasonable person to consider the statement false.") (citing *Cortes v. Twenty-First Century Fox Am., Inc.,* 285 F. Supp. 3d 629, 642 (S.D.N.Y.), *aff'd*, 751 F. App'x 69 (2d Cir. 2018).

Plaintiffs have not plausibly alleged the falsity of the challenged statements, each of which sets forth how, *based on the Hacked Memo*, Plaintiffs are linked to a scheme related to the Sinaloa

cartel. Compl. ¶ 47. Specifically, the five challenged statements include four summary statements or headings[1] alluding to the main substantive statement, which reads as follows:

> In late 2022 and 2023, Mexican hackers leaked six terabytes of data from Mexican military and defense agencies, initially published by Colombia's leading news radio network, W Radio. The Mexican government confirmed the leaks, now referred to as the 'Guacamaya Leaks.' … The intelligence reports detailed various aspects [of] the Sinaloa Cartel's criminal operations inside of Colombia … . More particularly, the ***memos described: … A 'back-to-back' scheme*** whereby, in short, Sinaloa cartel funds would be funneled to politicians as loans, and the debt from the politician would be repaid on their behalf by Barranquilla businessmen, ***including Jose and Christian Daes***, utilizing the proceeds of corrupt contract awards.

Compl. ¶ 47 (emphasis modified) (quoting Rep. at 12). The Report then embeds a screenshot of the relevant portion of the Hacked Memo, showing the redactions that concealed the names of the identified individuals. Rep. at 12-13 (also hyperlinked). The Report goes on to explain how Culper was able to circumvent the redactions, and it embeds a screenshot of the unredacted text showing the actual names of the businessmen who, *according to the Hacked Memo*, were part of the scheme. *Id.* The list includes Christian and José Daes. *Id.*

Nowhere in their 75-paragraph Complaint do Plaintiffs allege that this statement—*that the Hacked Memo identifies José and Christian Daes as businessmen implicated in the "back to back scheme"*—is false. **To the contrary—the Complaint *concedes* that José and Christian Daes' names were, in fact, behind the redactions in the Hacked Memo**. Compl. ¶ 57. This is fatal to Plaintiffs' defamation claim. *Dfinity Found. v. New York Times Co.,* 702 F. Supp. 3d 167, 175 (S.D.N.Y. 2023) (falsity element not alleged where statement "simply report[ed] the alleged

---

[1] The four other challenged statements include: the sub-heading to the article referencing how Plaintiffs were "alleged" to be connected to an illicit financing scheme "according to recently leaked intelligence memos" (Rep. at 2); the opening sentence to the Report summarizing Culper's short position because "new evidence … links Tecnoglass insiders … to Sinaloa cartel operations in Colombia," accompanied by the graphic showing the unredacted text of the Hacked Memo revealing the Daes Brothers' inclusion in a list of implicated businessmen (*id.* at 2-3); the introduction to the section of the Report detailing the specifics relating to the Daes' inclusion in the Hacked Memo, which previews "previously unreported evidence that [Culper] believe[s] ties Tecnoglass and the Daes brothers to the infamous Sinaloa cartel" (*id*. at 12), and the headline to that section, entitled "Tecnoglass Executives Jose and Christian Daes Named by Mexican Intelligence as Involved in Sinaloa Cartel Election Scheme" (*id.*), with further details to follow.

findings contained in [a third-party] Report"), *aff'd*, 2024 WL 3565762 (2d Cir. July 29, 2024); *Henry*, 629 F. Supp. 3d at 146-48 (finding falsity element not pled where challenged statements merely described steps taken in response to complaint of sexual assault, and plaintiff could not plead those steps were not taken); *Cortes*, 285 F. Supp. 3d at 642 (same).

Rather than engage with what the challenged statements *actually say*, Plaintiffs blatantly mischaracterize the statements. First, Plaintiffs allege that the Report falsely accuses the Daes Brothers of participating in illegal cartel activity. But the Report made no such statement. Instead, the challenged statements recite the Hacked Memo's contents. Compl. ¶ 47 (Plaintiffs "alleged" to aid scheme "*according to recently leaked intelligence memos*"); *id.* (Plaintiffs "allegedly" participated in scheme according to "leaked documents"); *id.* ("we believe" memo "ties" Plaintiffs to cartel); *id.* (Plaintiffs "named" in "intelligence" memo); *id.* (Plaintiffs named in "intelligence reports"); *id.* ¶ 49 (Plaintiffs "allege[d]" to participate in scheme in hacked "intelligence memos").[2]

Next, Plaintiffs try to avoid their failure to allege falsity of the challenged statements by arguing that the Hacked Memo was fabricated and that, despite this, Culper falsely represented to readers that the Memo was authentic. Compl. ¶ 52-54; *id.* ¶ 4 ("Defendants represented the documents as government-confirmed"). Setting aside the fact that Plaintiffs have not plausibly alleged that the Hacked Memo was actually fabricated, this accusation is another clear mischaracterization of the Report. The Report nowhere *affirms* the authenticity of the Hacked Document. Plaintiffs point to the Report's statement that the "Mexican government confirmed the leaks," (Rep. at 12), suggesting this statement somehow represents the Report's guarantee that the Hacked Memo was authentic. Compl. ¶ 53. But this is a deliberate misreading of the Report, which instead properly noted that the Mexican government confirmed that "the 'Guacamaya Leaks'" had

[2] The same defenses apply to both the statements in the Report and the X posts described in Compl. ¶ 49, which cite, hyperlink, and summarize the Report.

actually occurred. Rep. at 12 ( "In late 2022 and 2023, Mexican hackers leaked six terabytes of data from Mexican military and defense agencies, initially published by Colombia's leading news radio network, W. Radio," and linking articles for the proposition that followed regarding the Mexican government "confirm[ing] the leaks, now referred to as the Guacamaya Leaks").

Indeed, rather than somehow "*authenticating*" the Hacked Memo, the Report provides readers with information to help them make their own assessment of the credibility of the document. The Report makes clear that the Hacked Memo was part of a large cache of documents leaked by Mexican ***hackers***. Rep. at 12. The Report even acknowledged that the accuracy of the Hacked Memo had been publicly denied, noting that, "Banco Serfinanza denied the accusations, while Alejandro Char, also named in the reports, denied the accusations, threatened legal action, and claimed that 'we have never had contact with anybody related to drug trafficking or money laundering.'" *Id*. at 13 (citing and linking articles). In other words, the Report did not present its readers with just a one-sided picture of the Hacked Memo and its allegations.

Moreover, viewing the Report in its entirety, it is clear that the *veracity* of the Hacked Memo was not central to its thesis; instead, it was the *fact* that the Daes Brothers were named in the Hacked Memo that itself gave Culper substantial cause for concern. Rep. at 18 ("We believe there is significant risk to Tecnoglass" due to the Daes Brothers "being named in Mexican intelligence memos."). These public corruption allegations—whether true or not—Culper viewed as particularly problematic for Tecnoglass, according to the Report, in light of Executive Order 14157, which directs the State Department to designate drug cartels like the Sinaloa Cartel as "terrorist organizations [and] empowers U.S. authorities to freeze assets, impose sanctions, and prosecute those providing aid to the cartels." Rep. at 17.[3] Authentic or not, the fact that the Daes

[3] Plaintiffs confuse the Report's reference to EO 14157 and suggest that Culper should have known that Plaintiffs do not appear on the sanctions list maintained pursuant to said order. Compl. ¶ 61. The downside risk perceived by Culper

Brothers were named in the Hacked Memo might trigger enforcement under E.O. 14157, and could have serious ramifications for Tecnoglass.

Plaintiffs also try to weaponize the Report's disclaimer and distort its meaning to suggest that it "served to communicate Defendants' endorsement of the [Hacked Memo] as authentic." Compl. ¶ 54. This is an outrageous allegation that selectively quotes and fixates on just 22 of the disclaimer's nearly 700 words: "all information contained herein is accurate and reliable, and has been obtained from public sources [Culper] believe[s] to be accurate and reliable." Rep. at 1. This framing intentionally omits the immediately surrounding text, which reads:

> ***To the best of our ability and belief***, all information contained herein is accurate and reliable, and has been obtained from public sources we believe to be accurate and reliable, ... ***However, such information is presented 'as is,' without warranty of any kind—whether express or implied. Culper makes no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information or with regard to the results to be obtained from its use.***

*Id.* (emphasis added). The disclaimer, in full context, expressly disclaims any guarantees as to the information presented in the Report, in diametric opposition to Plaintiffs allegations.[4] *See, e.g.*, *BYD Co. Ltd. v. VICE Media LLC*, 531 F. Supp. 3d 810, 818 (S.D.N.Y. 2021) ("[T]he Court must assess not only ... the meaning of the words as they would be commonly understood ... but also the words considered in the context of their publication.") (cleaned up).

In any event, Plaintiffs have nowhere challenged a single one of the Report's actual statements as false. Their defamation claim therefore fails.

### B. In the Alternative, The Challenged Statements are Not Actionable Because They are Protected Opinion

Plaintiffs point to no specific statements in the Report where Culper offers its opinions as

---

is clearly due to the fact that Plaintiffs *do not* appear on the sanctions list. Rep. at 17-18.

[4] In yet another mischaracterization of the Report, Plaintiffs allege that Culper represented the Hacked Memo as "new" and "uncovered" despite the fact the Memo circulated in 2023. Compl. ¶ 48. Yet it is clear from the plain text of the relevant statement (Compl. ¶ 47, second bullet) that "new" and "uncovered" refer to the previously unreported revelation that the Memo's redactions can be circumvented and the Daes Brothers being named, not the Memo itself.

to the authenticity of the Hacked Memo. But to the extent Plaintiffs *suggest* that the Report opines on the Hacked Memo's authenticity (the Report does no such thing), to the extent Culper found the Hacked Memo a reliable basis for forming its opinions, this conclusion would be protected under both the United States and New York Constitutions. That is because the Report disclosed numerous additional facts corroborating the core concerns of the Hacked Memo—and Plaintiffs do not allege any of them are false.

New York courts have long held that statements of "pure opinion"—*i.e.*, an opinion statement "accompanied by a recitation of the facts upon which it is based"—cannot trigger liability. *Steinhilber v. Alphonse*, 68 N.Y.2d 283, 289 (1986); *Gross v. N.Y. Times Co.,* 82 N.Y.2d 146, 154 (1993) ("[A] proffered hypothesis that is offered after a full recitation of the facts on which it is based is readily understood by the audience as conjecture."). In determining whether a statement is fact or opinion, courts "recognize[] and utilize[] the important distinction between a statement of opinion that *implies a basis in facts which are not disclosed* to the reader or listener and a statement of opinion that is *accompanied by a recitation of the facts on which it is based* or one that does not imply the existence of undisclosed underlying facts." *Consortium for Indep. Journalism, Inc. v. United States,* 2025 WL 919504, at *16 (S.D.N.Y. Mar. 26, 2025) (emphasis in original). "[T]he latter is not actionable because a statement of opinion offered after a recitation of the facts on which it is based is likely to be understood by the audience as conjecture." *Id*.

In line with this precedent, courts routinely dismiss defamation claims in connection with investment analysis reports where the conclusions are supported by fully disclosed facts. *See, e.g.*, *Cassava Sciences., Inc. v. Bredt,* 2024 WL 555484, at *10 (S.D.N.Y. Jan. 3, 2024) (recommending dismissal of defamation claims against short-sellers as opinions where statements were accompanied by a recitation of the facts on which they were based), *report and recommendation*

*adopted*, 2024 WL 1347362 (S.D.N.Y. Mar. 28, 2024); *Eros Int'l PLC v. Mangrove Partners,* 140 N.Y.S.3d 518, 519 (1st Dep't 2021) (short-seller's "statements were accompanied by a recitation of facts on which they were based and therefore were nonactionable opinion"). Moreover, "[t]hat one may dispute the conclusions drawn from the specified facts is not, however, the test. So long as the opinion is accompanied by a recitation of the facts upon which it is based it is deemed a 'pure opinion' and is afforded complete immunity even though the facts do not support the opinion." *Parks v. Steinbrenner,* 131 A.D.2d 60, 66 (1st Dep't 1987); *Consortium for Indep. Journalism*, 2025 WL 919504, at *18; *see also Rapaport v. Barstool Sports Inc.*, 2024 WL 88636, at *4 (2d Cir. Jan. 9, 2024) (affirming finding that even an "erroneous understanding" of disclosed facts qualified as protected opinion).

Again, Culper never opined on the authenticity of the Hacked Memo. But to the extent it relied on the Hacked Memo in drawing its conclusions about Tecnoglass, that opinion is protected.

First, just considering the context of the statements, the very "purpose" of its Report was to offer its inherently subjective opinion on Tecnoglass, disclosing in its very first sentence that it had a bias as a *short seller*. Where an author reveals that its writing has an agenda or a bias, this signals to the reader that the statements cannot be taken as fact but rather as expressions of the author's opinion. *Brian v. Richardson,* 87 N.Y.2d 46, 53 (1995) (author's disclosure that "he was not a disinterested observer," "supports the conclusion that the specific accusations of which plaintiff complains could not have been understood by a reasonable reader as assertions of fact that were proffered for their accuracy"). Courts routinely find that a disclosed short position is an indicator to readers of opinion. *See, e.g.*, *Eros Int'l. PLC v. Mangrove Partners*, 2019 WL 1129196, at *8 n.6 (Sup. Ct. N.Y. Cnty. Mar. 8, 2019) (where short position is disclosed, "courts have traditionally viewed an author's announced self-interest as evidence that the author's

statements likely constitute opinions, not facts"), *aff'd*, 191 A.D.3d 465 (1st Dep't 2021); *Silvercorp Metals Inc. v. Anthion Mgmt. LLC*, 36 Misc.3d 1231(A), at *10 (Sup. Ct. 2012) (disclosure of short position in plaintiff's stock demonstrates ulterior motive "indicat[ing] to the reader that the author is expressing his opinion").

Moreover, the structure and tone of the Report further confirm that the Report's conclusions are Culper's opinions. The Report opens with a summary of its beliefs, which it so-titles as its "Summary of Culper Research ***Opinions***." Rep. at 5. And in detailing those self-described "[***o***]***pinions***" (*id.*), Culper repeatedly reminds its audience that it is only offering just that—opinions. The Report includes a raft of qualifiers, making clear that Culper is only recounting its "opinions," "views," "beliefs," among other words of conjecture. *See generally id*. These qualifiers make clear that Culper was offering its opinions based on the disclosed facts. *See Cassava,* 2024 WL 1347362, at *1 ("[T]his statement signals it is an opinion by using three different qualifiers: 'appears to be,' 'allegedly,' and 'appear to be.'"). All of this context makes clear that a reader would have reasonably understood the Report to be providing opinions based on disclosed facts. The Report therefore is absolutely protected.

Moreover, and critically, the Report contained a thorough disclosure of the facts upon which any reliance on the Hacked Memo was based—and Plaintiffs do not allege that any of these facts are false. The Report details the indicia of legitimacy of the Hacked Memo as well as extensive facts corroborating the allegations in the Hacked Memo and the alleged connections to the Daes Brothers, which are set forth herein at pp. 5-7. *See* Rep. at 2-7, 10-24. Plaintiffs do not dispute any of these facts. Based on those undisputed facts, which Culper disclosed and cited, Culper was fully entitled to draw conclusions based on the Hacked Memo. *Cassava*, 2024 WL 555484, at *10-12 (short-seller report inactionable where it cited and referred to its underlying

source and merely drew inferences from such source).

### C. Plaintiffs Have Not Plausibly Alleged Actual Malice

Finally, even if the Court were to accept the premise that any of the statements in the Report are false (and they are not), Plaintiffs' claims also fail for the independent reason that they have not plausibly alleged actual malice. Under New York law, a plaintiff alleging defamation in connection with statements made "in a place open to the public or a public forum in connection with an issue of public interest" is subject to an additional requirement that the statement was made with actual malice. N.Y. Civ. Rights Law § 76-a(1)(a)(1), (2). This requirement applies at the pleadings stage. *See 1st Amendment Praetorian v. New York Times Co.,* 2025 WL 949575, at *8-10 (S.D.N.Y. Mar. 28, 2025) (dismissing complaint for failure to plead actual malice as required by Section 76-a). "Public interest" is "construed broadly, and shall mean any subject other than a purely private matter." N.Y. Civ. Rights Law § 76-a(1)(d). The Report, which implicates Plaintiffs' alleged cartel connections, clearly qualifies.[5]

The actual malice standard imposes a steep pleading hurdle that Plaintiffs cannot clear. Plaintiffs needed to allege (plausibly) that Culper published each challenged statement "with knowledge of its falsity or with reckless disregard of whether it was false." N.Y. Civ. Rights Law § 76-a(2). This is a subjective standard, requiring Plaintiffs to plead that Culper "actually entertained serious doubts about the veracity" of its statements. *Dfinity*, 702 F. Supp. 3d at 176. This is a "difficult standard to meet, and quite purposefully so" as "neither the defense of truth nor the standard of ordinary care" adequately "protect[s] against self-censorship and thus adequately implement[s] First Amendment policies." *Biro*, 963 F. Supp. 2d at 277 (citing *St. Amant v. Thompson*, 390 U.S. 727, 731-32 (1968)); *see also Dfinity Found. v. New York Times Co.,* 2024

---

[5] Plaintiffs' claims are also subject to an actual malice standard because Plaintiffs—the CEO and COO of Tecnoglass, a multi-billion dollar, publicly traded corporation—are limited purpose public figures.

WL 3565762, at *1 (2d Cir. July 29, 2024) ("The hurdles to plausibly pleading actual malice . . . are significant given the First Amendment interests at stake in defamation cases.") (cleaned up).

Plaintiffs try to satisfy the actual malice standard by pointing to both "public information available to Defendants prior to publication," as well as purported "red flags" relating to the authenticity of the Hacked Memo. Compl. ¶¶ 58-59. But neither comes close to satisfying the actual malice standard. First, because the Report does not endorse the underlying truth of the statements in the Hacked Memo, only that it says what it says—there is no falsity. But, even so, Plaintiffs' "red flags" and "public information" (which Plaintiffs now twist in an attempt to salvage their claims) cannot support actual malice. That is because, as New York courts have held, even if Plaintiffs can point to "contrary information," that, "at best," constitutes an allegation "that defendant did not know if the [the Hacked Memo was authentic] and failed to verify"—[b]ut that is insufficient to raise an inference of actual malice, as all that those allegations plausibly suggest is a negligent failure to uncover the truth rather than a subjective awareness of falsity." *Bloom*, 735 F. Supp. 3d at 474 (citing *Liberman v. Gelstein*, 80 N.Y.2d 429, 438 (1992)).

The "public information" that Plaintiffs cite does not demonstrate that Culper acted with actual malice. Plaintiffs use strong, definitive language to argue that the Hacked Memo is inauthentic, claiming that the "[Hacked Memo] ***had … been found to be inauthentic by multiple Mexican authorities***" (Compl. ¶ 48), and the "public record … ***thoroughly dispelled the [Hacked Memo's] authenticity and the credibility of the allegations therein***." *Id.* ¶ 32; *see also id.* ¶ 50 (suggesting the public record "already discredited the very documents [the challenged] statements rely on"). But the actual facts alleged certainly do not support those bold assertions.

Plaintiffs point to a statement by the Mexican government they claim undermines the authenticity of the Hacked Memo. *Id.* ¶ 34. But this is plainly not the case. The Mexican

government statement—which stated only that "certain documents" arising from the leaks "are not considered official"—says nothing at all as to the veracity of the individual Memo on which Culper relied. Further, there is a stark gap between a document being considered "official" (would any government ever call any leaked documents "official"?) and a document being fabricated, as Plaintiffs baldly claim.

Plaintiffs also point to the self-serving statements of other parties implicated by the Hacked Memo, including Banco Serfinanza and Alejandro Char, each of whom "publicly denied" or "denounced" the accusations. Compl. ¶¶ 36-38, 73.

But Culper *included these denials in its Report* (Rep. at 13)—behavior that courts have found is "far from what might be expected of an author acting with actual malice." *Biro*, 963 F. Supp. 2d at 288 (citing *Harris v. City of Seattle*, 152 F. App'x 565, 569 (9th Cir. 2005) ("the fact that [defendant] included [plaintiff's] denials in its broadcast rebuts an inference of actual malice."); *MiMedx*, 2018 WL 4735717, at *11 (publication of denial "undercut[s] any inference of actual malice."); *Cabello-Rondon v. Dow Jones & Co., Inc.,* 2017 WL 3531551, at *10 (S.D.N.Y. Aug. 16, 2017), *aff'd*, 720 F. App'x 87 (2d Cir. 2018) (as article published denials, it "cannot be said to evince an intent to deliberately avoid learning or portraying the truth.").

In any event, the denials would have limited utility for Plaintiffs. They are hardly surprising considering the self-interest of those parties, and they therefore have no bearing on actual malice. *See, e.g.*, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 692, n.37 (1989) ("Of course, the press need not accept 'denials, however vehement; such denials are so commonplace'" that they do not suggest any "likelihood of error."); *MiMedx Grp., Inc. v. Sparrow Fund Mgmt. LP*, 2018 WL 4735717, at *9 (S.D.N.Y. Sept. 29, 2018).[6]

[6] The same is true for the unsurprising government denials in the Amparo proceeding described in Compl. ¶ 42.

Next, Plaintiffs argue that Culper *should have known* the Hacked Memo was fabricated based on a brazen mischaracterization of a constitutional judicial proceeding in Mexico (the "Amparo Proceedings"), which did not (despite Plaintiffs' say-so) result in a judicial finding that the Hacked Memo was "found to be inauthentic." Compl. ¶ 48. This type of proceeding merely requires the complainant (here, Banco Serfinanza) to prove that the Mexican government had violated its constitutional rights; and in this proceeding, Banco Serfinanza needed to prove the government improperly ordered and maintained government investigations into the bank. The purpose of such proceeding was not, as Plaintiffs suggest, "to obtain a judicial determination that the [Hacked Report] was not authentic." *Id.* ¶ 42. As Plaintiffs allege, at the hearing, the Mexican government defendants—predictably—denied that there was any such investigation ordered and included denials regarding the Hacked Memo, and these self-serving denials should be understood with the skepticism the Supreme Court directed in *Harte-Hanks* over three decades ago. *Harte-Hanks Comm'ns*, 491 U.S. at 692, n.37. Ultimately, the court found that in the absence of corroborating official records, the Hacked Memo was not probative "evidence" or independent proof of the acts described in the Hacked Memo. In other words, the court made no ruling on whether the Hacked Memo was authentic or inauthentic; it merely held that *media reports regarding the Memo could not serve as the sole evidence in a constitutional proceeding regarding Serfinanza's constitutional rights*.[7] That limited, evidentiary finding—on the burden of proving a constitutional claim—is a far cry from Plaintiffs' suggestion that this proceeding "found [the Hacked Memo] to be inauthentic." Compl. ¶ 48.[8] They certainly offer nothing to disprove the

[7] *See Banco Serfinanza, S.A.,* Juicio de Amparo Indirecto 2135/2023 (Juzgado Decimoquinto de Distrito en Materia Administrativa en la Ciudad de México Distrito [District Court] Aug. 26, 2025) (Mex.).

[8] Nor does "Semana's February 17, 2024 publication" of the "sworn denial[s]" warrant that conclusion. Compl. ¶¶ 41, 73. The article cited in the Complaint merely summarizes the Amparo Proceedings which, again, have no bearing on the Memo's inauthenticity.

undeniable fact that the Hacked Memo explicitly identified Plaintiffs by name, which is all Culper ever actually stated in its Report.

Finally, Plaintiffs rely on a purported Colombia Attorney General criminal investigation of the individuals named in the Hacked Memo, and baldly suggest this investigation "concluded … that no evidence supported the [Hacked Memo's] allegations." Compl. ¶ 43. While Plaintiffs claim that the results of this investigation were "publicly available" on the Colombia Attorney General's "case-lookup portal," (*id.*), it is telling that—in stark contrast to the citations and links in the Report—Plaintiffs have not included a link to this purportedly "publicly available" document, nor have they included a screenshot of it, nor have they quoted it. Perhaps, in opposition, Plaintiffs will illuminate the Court as to where this "publicly-available" document can be found. Putting aside whether this document was (or is) publicly available or known to Culper, nothing in Plaintiffs' description demonstrates that Culper had subjective misgivings about anything in the Report. To the contrary, the purported investigation conclusion appears to say only that there was no extrinsic evidence to support the contents of the Hacked Memo or its authenticity sufficient to support the criminal prosecution of those identified—*not* that the Hacked Memo actually was not authentic. This is not an adequate basis to allege actual malice. *See 1st Amendment Praetorian*, 2025 WL 949575, at *10 ("While a speaker may be found to have acted with actual malice if a plaintiff can allege that the speaker specifically reviewed a contrary publication previously, a speaker is not otherwise required to seek out contrary stories.").

Against this backdrop, Plaintiffs ignore the many indicia of reliability *in the public domain* that Culper discussed and disclosed in the Report. As Plaintiffs affirmatively concede, the Mexican government was indeed hacked in the Guacamaya Leaks (Compl. ¶ 33), as the Mexican government itself confirmed. Rep. at 12. And the leak involved "six terabytes of data"—not just

the Hacked Memo referenced in the Complaint. Rep. at 12. Further, as Plaintiffs admit, Mexican and Colombian media outlets reported that the Hacked Memo arose from those leaks. Compl. ¶ 35. Plaintiffs try to undermine this point by suggesting that a "Colombian fact-checking outlet" found "the accusation was unfounded." *Id.* ¶ 39. Plaintiffs do not explain *which* accusation this purported "fact-checking outlet" was referencing, and the only grounds they provide are that the media outlets that previously published the Hacked Memo "presented no evidence or testimony in support of it." *Id.* In other words, Plaintiffs suggest that because the media outlets publishing the Hacked Memo did not affirmatively present ***additional testimony*** that it was legitimate, a random Columbian fact-checking website's conclusion on that basis is somehow reason for Culper to have entertained "serious doubts" about its reliability. That is simply implausible.

The Report also discloses numerous additional facts corroborating Plaintiffs' ties to cartel operations, election rigging, and public corruption—and to Banco Serfinanza, the Char family, Amaris, and Gerlein (Rep. at 2-6, 10-24)—the same cast of characters described in the Hacked Memo. Indeed, as set forth above, the Hacked Memo ties the identified businessmen to an illicit financing scheme centered in Barranquilla, using Banco Serfinanza. Char, Gerlein, and Amaris names all figure prominently, and as the Report describes in detail with hyperlinks, Plaintiffs (and multiple additional Tecnoglass insiders and Daes family members) possess longstanding connections to these institutions and families. *Id.* at 2-7, 10-24. *Plaintiffs do not deny any of these ties in their Complaint.* Moreover, the Report discloses prior allegations of Daes' cartel connections in the Hindenburg Report. These public facts, unchallenged by Plaintiffs, undermine any suggestion of actual malice as it relates to Culper's reliance on the Hacked Memo.

The Report makes clear all the grounds supporting Culper's opinions and statements. *Dfinity*, 702 F. Supp. 3d at 176 (no actual malice where defendants "named their publicly available

sources and included links to those sources throughout the Report"). Given these facts, the "public information" on which Plaintiffs argue actual malice falls far short of demonstrating that Culper ***actually*** entertained doubts about the veracity of the challenged statements.

Plaintiffs fare no better by pointing to purported "red flags" about the origin of the Hacked Memo and the Memo itself. Of course, "red flags" as to authenticity are not evidence to the contrary—but the "red flags" Plaintiffs cite are simply irrelevant. Plaintiffs suggest that the fact that Culper was able to circumvent the redactions in the Hacked Memo was somehow "a clear red flag that, on information and belief, put Defendants on notice that the [Memo] was not authentic." Compl. ¶ 57. This is ludicrous and certainly implausible. Redaction failures are (unfortunately) common, even in high profile documents intentionally released by the U.S. government. *See, e.g.*, *United States v. Maxwell,* 2026 WL 279487, at *1 (S.D.N.Y. Feb. 3, 2026) (noting "thousands" of redaction errors made by the DOJ in releasing the Epstein files); *see also McIntosh v. Katapult Holdings, Inc.,* 2023 WL 5049044, at *3 (S.D.N.Y. Aug. 8, 2023) (law firm made redaction error whereby redactions could be circumvented by copying and pasting the redacted text); *Dawson v. Merck & Co.,* 2021 WL 242148, at *1 (E.D.N.Y. Jan. 24, 2021) (same). A redaction error in a Mexican intelligence Memo—one that was never intended to be released—in no way indicates (let alone "clearly") that the document was "fabricated."

Plaintiffs also argue that Culper should have "heavily scrutinized" its reliance on the Hacked Memo because it was unearthed by a hacking group that was "an anonymous criminal outlet that had taken credit for extensive criminal acts committed in the name of an activist agenda" (Compl. ¶ 55)—but the unsavory ways in which these documents were retrieved, or the agendas of the hackers (and no hackers are operating within the bounds of the law) say nothing about whether the hacked documents were *authentic*. Indeed, there is a long tradition beyond the

Guacamaya Leaks of groups leaking sensitive, confidential, and ***authentic*** government documents to the public, and thereafter being subject to criminal liability. *See, e.g.*, DOJ, *WikiLeaks Founder Pleads Guilty and Is Sentenced for Conspiring to Obtain and Disclose Classified National Defense Information* (June 25, 2024), https://www.justice.gov/archives/opa/pr/wikileaks-founder-pleads-guilty-and-sentenced-conspiring-obtain-and-disclose-classified (last visited Sept. 21, 2026). There is also a longstanding tradition of those reporting on such leaks—which is all Culper did.

Last, Plaintiffs plead in conclusory fashion several purported "facial abnormalities" that they suggest cast doubt on the Memo's authenticity. Compl. ¶¶ 56, 58. But many of these are completely false and certainly implausible. For example, Plaintiffs cite "inconsistent formatting, such as differing typefaces in the body text and page-numbering footers, and irregular paragraph alignment." *Id.* ¶ 58. To the extent that these abnormalities even exist (which Culper disputes), they are not apparent. For example, the footer and the body appear to be in the same type face and the document maintains the same, multi-level-outline paragraph alignment throughout. *See* Hacked Memo.[9] And while Plaintiffs further claim that the seals on the Memo "do not match the official Mexican government's coat of arms" (Compl. ¶ 58), that is patently untrue. This Court can take judicial notice of the fact that the seal displayed on the Hacked Memo is a clear match for the seal of the Secretary of Foreign Affairs of Mexico (Secretaría de Relaciones Exteriores). *Compare* Gobierno de México, *Relaciones Exteriores*, https://www.gob.mx/sre (last accessed September 21, 2026) (official website of the Secretary of Foreign Affairs of Mexico displaying seal); *with* Hacked Memo. Finally, Plaintiffs claim that the Memo's letterhead lists "country before city, which is the reverse of the convention used in communications from the Mexican government." Compl. ¶ 58. Plaintiffs present this statement in conclusory fashion without citing

[9] The Hacked Memo may also be considered here as it was incorporated by reference in the Complaint. *Jacob*, 626 F. Supp. 3d at 684; *I.S. Sahni, Inc. v. Scirocco Fin. Grp., Inc.,* 2005 WL 2414762, at *4 (S.D.N.Y. Sept. 28, 2005).

to this supposed convention or even an exemplar document. But even if this is a true convention, the Memo's departure from it would again be explainable by informal memo or typographer error. Also, there is no reason to think that Culper was on the hook for checking such things during its investigation. Are we supposed to count the number of arrows the eagle is clutching in the United States Great Seal before commencing oral argument in this Court? Plaintiffs offer no allegations that Culper had actual knowledge of these supposed formatting conventions.

Finally, Plaintiffs make half-hearted attempts to allege actual malice by making boilerplate allegations of profit motive (particularly because Culper is a short seller) and inadequate investigation. Compl. ¶¶ 5, 64, 66. Courts routinely reject these types of allegations. *See, e.g.*, *Bloom*, 735 F. Supp. 3d at 474 ("[I]t is well-established" that "a failure to investigate" "is insufficient to show actual malice"; and "a desire to turn a profit does not in and of itself indicate a defendant acted with actual malice") (quoting *Harte-Hanks*, 491 U.S. at 667 ("[T]he fact that the defendant published the defamatory material in order to increase its profits" cannot "prove actual malice."); *Cassava*, 2024 WL 1347362, at *25 (short-seller's supposed "profit motive" "does not lead the Court to infer that they did not subjectively believe those critiques"); *MiMedx*, 2018 WL 4735717, at *12 (same). Setting aside that their position is *legally* foreclosed, Plaintiffs have no *factual* basis for arguing that Culper failed to conduct an adequate investigation either. Plaintiffs specifically argue that Culper must have had actual knowledge of the Report's falsity because, according to them, a thorough investigation would have revealed to Culper that the Hacked Memo was fabricated. But Culper never said the Memo was legitimate—it only recited the Memo's contents and made clear it was only repeating them.

Lastly, Plaintiffs attempt to plead actual malice by pointing to Culper's purported refusal to retract its Report. Compl. ¶¶ 65-66. But Culper's alleged refusal to issue a retraction occurred

*after* the statements in the Report were made—thus, it says nothing as to Culper's state of mind *at the time of publication*. *Biro*, 963 F. Supp. 2d at 281 ("a failure to retract occurs, by definition, *after* publication, meaning that its probative value as to a defendant's state of mind at the time of publication is dubious at best"; a "defendant's decision not to retract" fails for actual malice).

### D. CULPER IS ENTITLED TO ITS FEES UNDER NEW YORK'S ANTI-SLAPP LAW

If Defendants prevail on their motion to dismiss for any of the reasons set forth above, Defendants should be awarded attorney's fees and costs pursuant to New York's anti-SLAPP statute, which awards fees and costs where "the action involving public petition and participation was commenced or continued without a substantial basis in fact and law." N.Y. Civ. Rights Law § 70-a(1)(a). This action clearly qualifies. In *Bobulinksi v. Tarlov*, 758 F. Supp. 3d 166, 189 (S.D.N.Y. 2024), Judge Oetken applied fee-shifting where defendants prevailed on their motion to dismiss. Defendants acknowledge that the question of whether fees pursuant to the anti-SLAPP statute can be sought in connection with a Rule 12(b)(6) motion is in flux, and the question is currently before the Second Circuit. *Wang v. Sussman*, Nos. 25-2487-cv, 25-2503-cv. Defendants therefore respectfully request that this request for fees pursuant to the anti-SLAPP statute be, at minimum, held in abeyance pending the determination of the *Wang* appeal by the Second Circuit.

## CONCLUSION

For the foregoing reasons, this Court should grant the Motion, dismiss Plaintiffs' Complaint with prejudice, and award Defendants attorney's fees and costs.

Dated: New York, New York
October 1, 2026

Respectfully submitted,

**COZEN O'CONNOR**

By: *<u>/s/ Michael B. de Leeuw</u>*
Michael B. de Leeuw
Tamar S. Wise
mdeleeuw@cozen.com
twise@cozen.com
3 WTC, 175 Greenwich Street, 55th Floor
New York, New York 10007
Telephone: (212) 908-1331
Fax: (646) 461-2090

*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that, on October 1, 2026 I caused the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorneys of record for all parties, including, but not limited to:

Alex Spiro
Quinn Emanuel Urquhart & Sullivan, LLP
295 5th Avenue
New York, NY 10016
212-849-7000
alexspiro@quinnemanuel.com

Danielle Zoellner
Quinn Emanuel Urquhart & Sullivan
295 Fifth Avenue
New York, NY 10016
212-849-7631
daniellezoellner@quinnemanuel.com

Hope Delaney Skibitsky
Quinn Emanuel Urquhart & Sullivan, LLP
295 Fifth Avenue
New York, NY 10016
212-849-7535
hopeskibitsky@quinnemanuel.com

Michael Ryan Bloom
Quinn Emanuel Urquhart & Sullivan, LLP
295 Fifth Ave.
9th Floor
New York, NY 10016
212-849-7000
michaelbloom@quinnemanuel.com

Dated: October 1, 2026

*/s/ Michael B. de Leeuw*
Michael B. de Leeuw